## Friese's Estate.

Argued September 29, 1939. Before SCHAFFER, MAXEY, LINN, STERN and BARNES, JJ.

242

*Harry F. Stambaugh,* with him *J. Randall Thomas,* for appellants.

*Donald Thompson,* with him *Harbaugh Miller* and *Stephen Emery,* for appellee.

OPINION BY MR. JUSTICE MAXEY, November 27, 1939:

Charles A. O. Friese and Mary W. Portman executed an antenuptial agreement on January 17, 1928. In the preamble it is stated that "it is the wish and intention of the said Charles A. O. Friese to leave the greater part of his estate to his son and daughter, children of his first wife, and their heirs." The agreement also states: "It is mutually understood and agreed between the said parties hereto that said Mary W. Portman, his proposed second wife, shall not claim any part of the estate of the said Charles A. O. Friese except the amount given to her by his Last Will and Testament; but that the household goods and furniture (except family portraits) shall be and remain the property of said Mary W. Portman, after their marriage. And the said Charles A. O. Friese agrees that he will not claim any part of the estate of his proposed second wife except the amount given to him by her Last Will and Testament." By the terms of the agreement, Mr. Friese agreed to pay and turn over to Miss Portman "money and securities to the amount of $10,000 to compensate for the loss of her insurance business and other sources of income," and on the day on which the agreement was signed Miss Portman receipted for the sum of $10,000 "in money and

securities, in fulfillment of above agreement." The parties to the contract were married one week after its execution.

Mr. Friese died on April 9, 1932, leaving to survive him his widow and two children by his former marriage, to wit: Walter A. Friese and Sarah M. Burkert, the appellants. In decedent's safe deposit box was found a testamentary paper dated December 22, 1930, but it was unsigned at the end thereof. He had written his name in every blank space provided for it in the body of the paper, including the testimonium clause and the attestation clause. Had the paper been signed at its end, it would have been a complete will. The paper provides in section 1 as follows: "Having provided for my wife, Mary W. Friese, in my lifetime, I now give her $1,000.00." Section 22 provides: "Subject to all the foregoing devises, etc., I do now give, devise and bequeath unto my beloved wife Mary W. Friese, my son Walter A. Friese and my daughter Sarah M. Burkert, their heirs and assigns forever, all the rest, residue and remainder of my estate whatsoever or wheresoever the same may be situate, share and share alike. This devise to my wife shall in no way break or invalidate an agreement entered into between Charles A. O. Friese and Mary W. Portman dated January 17, 1928, . . ." Section 23 provides: "I also give to my beloved wife Mary W. Friese all the ivory and all souvenirs I brought home from my travels." The will appointed the son and the daughter executors. On April 15, 1932, this unsigned paper was admitted to probate and letters testamentary were issued to the son and daughter. On June 30, 1932, the widow filed a petition praying that the probate of the will be vacated. After argument on the petition to probate, the court below held that the will was invalid because it was not signed. Letters of administration were granted to the widow. The son and daughter appealed from the grant of the letters and set up the antenuptial agreement, by which the widow released all her

interest in the estate of the decedent, and contended that the widow therefore had no interest in the estate and no right to act as administrator. Their petition was dismissed, and on appeal to this court, we reversed the court below (see *Friese's Est.*, 317 Pa. 86, 176 A. 225), and held that the widow was not entitled to letters of administration. The Orphans' Court thereupon revoked the grant of letters of administration to the widow and issued them to the son and daughter. The latter filed their account, and at the audit, Mrs. Friese, the widow, made a claim for one-third of the estate, because her husband did not bequeath and devise to her by a will, duly signed by him, and contended that the antenuptial agreement was therefore fraudulent and void. The auditing judge in his adjudication in that case held that "the dealings between the decedent and his wife were open and frank, that there was no imposition on her, and the amount she received under the agreement was fair and proper. We hold the antenuptial agreement to be valid, and Mary W. Friese, the widow, is bound by its terms." Mrs. Friese thereupon filed exceptions to the adjudication, which were dismissed, in part, by the court in banc.

The majority of the court in banc, President Judge TRIMBLE and Judge CHALFANT (Judge MITCHELL dissenting), held in the instant case that the language in the antenuptial agreement that the wife "shall not claim any part of the estate of" her husband "except the amount given to her by his Last Will and Testament," amounted to a covenant by the husband to make a will, and that his failure to sign the unsigned will was a breach of that covenant, and that "an issue should be awarded to the Court of Common Pleas to determine the amount of the liability due the widow for the breach of contract."

At the trial in the Court of Common Pleas of Allegheny County, the widow, as plaintiff, offered evidence to show that the decedent left a net personal estate of $14,961.56 and real estate stipulated to be worth $30,000.

The trial judge overruled defendants' motions for a non-suit and for a directed verdict, and submitted the case to a jury, which found a verdict in favor of the widow in the amount of $8,992.31. Defendants' motions for judgment n. o. v. and for a new trial were refused by the court in banc.

The return of the precept was filed in the Orphans' Court, and after argument the majority of the court (President Judge TRIMBLE and Judge CHALFANT), filed an opinion and decree awarding to the widow the amount of the verdict. Judge MITCHELL dissented. The son and daughter thereupon filed separate appeals to this court.

That the husband in the antenuptial agreement impliedly covenanted to make a will and in that will to give the woman who was to become his wife some "amount" is obvious, but that the covenant is unenforceable for lack of definiteness is equally obvious. An amount means quantity. Assuming that the husband meant an amount or quantity of money, and not of goods, an "amount" of money might be something of negligible value or of great value. Under the covenant in question the husband could have made a will bequeathing his wife only one dollar and she would have been obliged under the antenuptial agreement to accept *that* "amount" in full satisfaction of her claim against his estate.

It is an elementary essential of a contract that the nature and extent of its obligation be certain. Though both parties may think that they have made a contract, they may in fact not have done so, for the law and not the parties determine the requirements of a legal obligation.

Williston on Contracts (revised ed.) Vol. 5, sec. 1411-A, says: "The measure of damages for the breach of a contract to devise or bequeath property is the value of the property promised to be bequeathed or devised." In Vol. 1, sec. 43, he says: "One of the commonest kind

of promises too indefinite for legal enforcement is where the promisor retains an unlimited right to decide later the nature or extent of his performance." Among illustrations given is the following: "A promise to leave by will 'a share' of the testator's fortune or 'a child's part,' or that a daughter should 'be noticed' in the testator's will" (citing cases). Sec. 37: "An agreement in order to be binding must be sufficiently definite to enable a court to give it an exact meaning."

In *Purves's Estate,* 196 Pa. 438, 46 A. 369, this court held that a promise from a grandfather to a grandson as follows: "Attend to the business, and I will leave it to you as I promised you" was unenforceable for uncertainty. In *Walls' Appeal,* 111 Pa. 460, 5 A. 220, we held that the parol promise of a decedent to the mother of his niece, that if she would let his niece stay with him and his wife she, the niece, should have a good home as long as he lived, and at his death he would provide for her; that she should never want as long as she lived—is not capable of being enforced because its terms are hopelessly indefinite and uncertain as to length and amount of service, as well as to the compensation to be given. In *Graham v. Graham's Executors,* 34 Pa. 475, we held that the parol contract of a decedent, to give the plaintiff a certain portion of his estate, in consideration of services rendered, even if capable of being enforced, can only be, when clearly proved, by direct and positive evidence, and when its terms are definite and certain. In that case this court said, in an opinion written by Justice STRONG, that "at all events, the contract, if any, is too uncertain to admit of enforcement. How much did the decedent promise to give? The amount is uncertain, and, from the nature of the arrangement, is incapable of being rendered certain." See also *Sherman v. Kitsmiller,* 17 S. & R. 45.

There can be no award for breach of contract (except in certain cases an award of nominal damages) when there is no evidence produced by which the jury can

measure the damages. Damages cannot be awarded by guess work. The Restatement of the Law of Contracts, sec. 331, lays down the following: "Damages are recoverable for losses caused or for profits and other gains prevented by the breach only to the extent that the evidence affords a sufficient basis for estimating their amount in money with reasonable certainty." In *Rice v. Hill*, 315 Pa. 166, 172, 172 A. 289, this court held: "Damages are never presumed; the plaintiff must establish by evidence such facts as will furnish a basis for their assessment, according to some definite legal rule."

We agree with the court below that "actual fraud is not imputed to decedent." He made a writing in the form of a will and in it he gave his widow $1,000 and one-third of his residuary estate. But for some reason he failed to sign this testamentary paper "at the end thereof," as the law requires, and therefore the paper in the eyes of the law became a nullity.

The cases cited by appellee are inapposite. For example, in *Goeckel's Estate*, 131 Pa. Superior Ct. 36, it was held that where a man promised in an antenuptial contract to furnish his future wife "good and comfortable support," the Orphans' Court had the power to determine a just, fair and reasonable amount to carry out the covenant. In other words, what constituted "good and comfortable support" for the widow was capable of measurement. That provision came within the principle that "it is not necessary that a promise should within itself be certain if it contains a reference to some document, transaction, or *other extrinsic facts from which the meaning may be made clear* [italics supplied]: Williston, supra, Vol. 1, sec. 47. If in the antenuptial agreement before us, the husband had covenanted to make a will leaving to his widow (i. e. to the other party to the antenuptial agreement) a sum sufficient to provide for her future support and maintenance, we would have, as in *Goeckel's Estate*, an enforceable covenant.

The court below is impressed by the injustice which results to Mrs. Friese in a holding that she cannot enforce her late husband's promise, implied in the antenuptial agreement, to make a will and to leave her something sufficiently substantial to compensate her for her renunciation. We are likewise impressed with the unfortunate result the law compels us to reach. But we cannot depart from the conclusions in *Friese's Est.*, 317 Pa. 86, 91, that "if it [the antenuptial agreement] is valid," it bars the widow from "any interest" in her husband's estate. Antenuptial agreements frequently are designed to bar one intended spouse from any share in the other spouse's estate. It is clear that such was *not the intent* here, but the law makes that *the result in fact* of the language used in the covenant in question. Since Mrs. Friese, on January 17, 1928, when she was "Mary W. Portman, unmarried" and Mr. Friese's "proposed second wife," definitely agreed to "not claim any part of Mr. Friese's estate except the amount given to her by his last will and testament," she is bound by that promise, for when this case was remitted to the Orphans' Court by this Court in 1934 (317 Pa. 86), the former held that the agreement was valid. That adjudication stands.

It is unfortunate that Mrs. Friese did not see to it that her husband properly executed the testamentary writing he made and which he intended to be his will, but since he did not do so, no court can do it for him.

The decree is reversed and the record is remitted to the court below for further proceedings not inconsistent with this opinion.