**Mornes Estate**

*Errol Fullerton,* for accountant.

*Mont L. Ailey* for George H. Hammond, administrator.

*Chambers, Chambers & O'Neill* for Florence Mornes.

BRAHAM, P. J., December 14, 1951.—In this audit two claims remain undisposed of. One is the claim of George H. Hammond, administrator of Charles Hammond, Sr., for $4,000 with interest, based on a judgment note dated August 14, 1928, and payable in 15 years. The second is the claim of the widow to take against the will.

Two objections are made to the claim on the note. The first objection is that the note is barred by the presumption after 20 years. This contention may be summarily disposed of by reference to the principle that "the presumption of payment of a debt secured by a specialty runs from the time the debt is demandable": Fidelity Title & Trust Company v. Chapman, 226 Pa. 312; Camp et al. v. John et al., 259 Pa. 38, 41. Under this rule the note not being payable until 1943 was not outlawed.

The second objection to the note is that it was not given for any lawful consideration, does not represent a valid gift, but was given by the deceased for the fraudulent purpose of attempting to deprive his wife of any interest in his estate. The facts of the matter as we have found them are that about three years before his death Archibald Reed Mornes delivered the note in question to S. A. Weinschenk, trust officer of the Lawrence Savings & Trust Company, with directions to deliver it to Charles Hammond, Sr., after the death of the maker. Hammond was there at the time and signed an endorsement to the effect that he would not collect the note during the lifetime of Mornes. Mornes stated to Weinschenk that he wanted the note delivered to Hammond after his own death in order that his wife (Florence Mornes) would not get any part

of his real estate. The note was dated several years earlier. At the time of its date Mornes was married to his first wife; Charles Hammond, Sr., was a young man who had been reared by the family of the first Mrs. Mornes, and Mr. Hammond was in no circumstances to lend Mr. Mornes money. The note was intended as a gift.

The essentials of a gift of personal property inter vivos are well known. As stated in Kaufmann's Estate, 281 Pa. 519, 531, they are as follows:

" 'To make a valid gift inter vivos there must be a clear, satisfactory and unmistakable intention of the giver to part with and surrender dominion over the subject of the gift, with an intention to invest the donee with the right of disposition beyond recall, accompanied by an irrevocable delivery': Packer vs. Clemson, 269 Pa. 1, 3".

In Kaufmann's Estate the notes in question were found in the possession of deceased at the time of his death. The daughter who claimed them also had access to the box but the court found insufficient evidence of unequivocal delivery.

In Rynier Estate, 347 Pa. 471, a woman not married until she was 61 years old executed notes to her brother and gave them to Myers, a real estate man, telling him to deliver them to the brother after her death. There was held to be a valid gift although the effect was to exhaust the estate and leave the husband nothing. On the subject of delivery the court said as follows:

"Of course, the delivery need not be made directly to the beneficiary. The instrument may be placed in the possession of a third person for delivery upon the happening of a specified contingency or event, as, for example, the death of the donor; in such cases not only is the delivery valid, but it will be held to relate back to the time of the initial delivery if that be necessary to effectuate the donor's intention: Stephens vs. Huss,

54 Pa. 20; Stephens vs. Rinehart, 72 Pa. 434; Gish vs. Brown, 171 Pa. 479, 482, 33 A. 60; Levengood vs. Bailey, 1 Woodward 275; Wagoner's Estate, 174 Pa. 558, 564, 565; 34 A. 114, 116; Hartman's Estate (No. 2). 320 Pa. 331, 335, 182 A. 232, 233; Chambley vs. Rumbaugh, 333 Pa. 319, 322, 323, 5 A. 2d 171, 173."

Does it make any difference that decedent deliberately intended to deprive his wife of a share in his estate? Apparently not. This is the view to which we came with some reluctance in the equity case: Mornes v. L. S. & T. Co. 8 Lawrence 163, 166. A man may give away his property during his lifetime and leave his wife nothing if he does it without fraud and fraud is not found solely from the intention to deprive the wife of her beneficial interest: Bierne v. Continental-Equitable Title & Trust Co., 307 Pa. 571, 577. There is no evidence that Mornes intended to reserve the power to take the notes back. The notes are found to be valid claims.

The second general question for our consideration is presented by the election of Florence Mornes to take against the will of her husband. The election was timely made but is alleged by the executor and by the beneficiaries under the will to be unwarranted and invalid because of the antenuptial agreement entered into on May 28, 1931.

The antenuptial agreement was the basis of a bill in equity brought by Florence Mornes against Lawrence Savings and Trust Company et al. at December term, 1948, no. 2, in equity, to recover assets alleged to have been transferred by the husband in violation of the agreement. The adjudication which dismissed the bill will be found reported in 8 Lawrence 163.

It is sufficient at this time to state the general plan of the antenuptial agreement. Under its terms A. R. Mornes waived all right to his prospective second wife's separate estate. She waived all right to his real estate

and personal property to the extent of $6,000, that being apparently about the size of her separate estate. As to it she agreed:

"At his death the said sum of Six Thousand ($6,000.00) Dollars in value of his separate estate shall descend to and vest in his heirs at law in like manner as if they had never been married or in such person or persons and for such estate or estates as he shall by his last will and testament order and appoint."

A. R. Mornes then entered into a further covenant as follows:

"He will execute his will by which he shall give and devise to his then wife, now known as Florence Turner, all the rest, residue and remaider of his estate remaining after deducting the sum of Six thousand ($6,000.00) Dollars in value as above provided and after the deduction of all debts and expenses of the settling of his estate including transfer estate tax thereon for the term of her natural life or during her widowhood and provided further that she shall survive him."

After the making of the antenuptial agreement and before the death of A. R. Mornes three significant things happened. First, Mr. Mornes conveyed securities of the approximate value of $25,000 to his wife as his tenant by the entireties so that she became entitled to them upon his death. Second, Mr. Mornes conveyed property of the approximate value of $14,000 to Lawrence Savings and Trust Company as trustee for certain relatives and friends. This is the conveyance which the court refused to set aside in the equity proceeding above referred to. Third, when A. R. Mornes made his will he omitted entirely any mention of his wife, failing entirely to give her the life estate in all above $6,000 which was stipulated in the antenuptial agreement.

In this situation the widow invokes the prior breach of contract by her husband to justify her electing to

take against the will despite her specific agreement not to do so. The failure of the husband to make a will in his wife's favor as he had agreed to do was a breach of the contract: A. L. I. Restatement of the Law of Contracts §§312, 314; G. B. Hurt, Inc. v. Fuller Canneries Co., 269 Pa. 85; Fink's Estate, Hoon's Appeal, 157 Pa. 292. It was obviously a wilful breach and the law is always "less inclined if a breach is wilful to require the injured party to perform": A. L. I. Restatement of the Law of Contracts §275, Comment A.

In opposition to the claim of the widow, the executor argues that the breach was only partial and such as may easily be remedied by allowing the widow to claim as a creditor in her husband's estate and thus get just what the antenuptial contract provided. Under the antenuptial contract the wife became a creditor: Mahoney's Estate, 356 Pa. 358; Goeckel's Estate, 131 Pa. Superior Ct. 36. Whether a breach is total or only partial depends upon a number of factors and is often difficult to determine: A. L. I. Restatement of the Law of Contracts §§275, 317, 318.

The doctrine of substantial performance will be best understood when its beginnings are appreciated. It was never intended as a device to allow a party bound by a contract wilfully to breach it, hoping if his effort was not successful that the doctrine of substantial performance might be invoked to prevent his being put to any worse advantage than the contract provided. This would give the one guilty of a breach two chances, the innocent party but one. Rather the doctrine of substantial performance began in the interest of the obligor who strove in good faith fully to perform the contract but failed in some unimportant particular. The language of Justice Bell in Danville Bridge Company v. Pomroy and Colony, 15 Pa. 151, 159 is illuminating:

"Where a party, acting honestly, and intending to fulfil his contract, performs it substantially, but fails in some comparatively unimportant particulars, the other party will not be permitted to enjoy the fruits of such imperfect performance, without paying a fair compensation according to the contract, receiving a credit for any loss or inconvenience suffered. . . . Of course, the indulgence is not to be so stretched as to cover fraud, gross negligence, or obstinate and wilful refusal to fulfil the whole engagement, or even a voluntary and causeless abandonment of it."

See also on this point Sgarlat v. Griffith, 349 Pa. 42, 46.

Mr. Mornes' failure to make a will in his wife's favor must be viewed in the light of the changed circumstances following the making of the antenuptial agreement. He gave his new wife securities worth about $25,000 when their relations were harmonious. He placed assets of the value of $14,000 in trust for others and beyond her reach when relations had worsened. He placed a note for $4,000 payable to an old friend who paid nothing for it, in the hands of the Lawrence Savings & Trust Company, declaring that he meant to prevent his wife from getting anything from his real estate. He made a will ignoring his promise to leave her a life estate and left her nothing. Because of her husband's conduct the widow was placed in a dilemma. She must appear and claim as a creditor in which case she might expect to be confronted by the contention, raised in the suit in equity, that by accepting the gift of $25,000 she had disabled herself from gaining further advantage from her husband's estate; or she must take her husband's conduct at its face value, join with him in rejecting the antenuptial contract and take against the will.

She has adopted the latter course; in this she was within her rights. Whether we consider A. R. Mornes'

conduct as a representation to his wife that by the conduct of the parties, the entire basis of the antenuptial contract was abandoned and as an invitation to join in this interpretation; or whether he is found to have acted fraudulently, the result is the same. He breached the contract and she is not bound by it.

Entertaining these views we make the following:

### Decree Nisi

Now, December 14, 1951, the balance in the hands of the executor is directed to be distributed as follows:

```
Balance as shown by account .................$5,944.46
    Chambers, Chambers & O'Neill, costs
    in connection with widow's exemption.  $ 10.00
    Florence Mornes, widow's exemption.     500.00   $  510.00
                                                     ──────────
                                                     $5,434.46
    George Hammond, administrator of
    George Hammond, Sr., $4,000 with
    interest from September 11, 1948,
    on account ................................$5,434.46
```

This decree shall become absolute unless exceptions are filed within 10 days.