Harrison Estate.

Argued January 10, 1974. Before JONES, C. J., EAGEN, O'BRIEN, ROBERTS, POMEROY, NIX and MANDERINO, JJ.

*Marvin Comisky,* with him *Samuel N. Rabinowitz, Morey S. Rosenbloom, M. Paul Smith, Blank, Rome, Klaus & Comisky,* and *Smith, Aker, Grossman, Hollinger & Jenkins,* for appellant.

*Howard J. Kaufman,* with him *Edward N. Polisher,* and *Cohen, Shapiro, Polisher, Shiekman and Cohen,* for appellees.

OPINION BY MR. JUSTICE ROBERTS, April 23, 1974:

On June 5, 1968, decedent Jules Harrison executed a will which made certain specific bequests and directed his executors—the Bryn Mawr Trust Company, his daughter, and his attorney—to hold the residue of his estate in trust for his daughter. Approximately two years later, on June 13, 1971, Mr. Harrison and appellant, Betty Rudley Harrison were married. It was the second marriage for each.

Prior to this marriage on May 7, 1971, the couple executed an antenuptial agreement in which Jules Harrison fully and fairly disclosed the extent of his property. The parties, each represented by counsel, agreed that neither would have any claim against the estate of the other except to the extent either might voluntarily provide. These reciprocal waivers were "in consideration of their contemplated marriage and of the mutual covenants and releases herein contained . . . ."[1]

The covenants relevant to the present controversy are found in paragraph 1, and require Mr. Harrison to

---

[1] Paragraphs 4 and 5 of the agreement provide respectively that neither party shall have any claim against the estate of the other and that each party shall independently own, control, and dispose of his or her own property. Not insignificantly, each of these paragraphs begins: "Provided that the aforementioned testamentary trust is created and maintained . . . ."

create by will a trust funded with at least $150,000. The entire net income from this trust was to be distributed to Mrs. Harrison quarterly, or in more frequent installments until her death or remarriage. Additionally, the trustees to be selected by Mr. Harrison would be authorized, in their discretion, to use whatever principal might be required to provide for Mrs. Harrison's medical and hospital care. If the net income in any year should be less than $12,000, the trustees were to be empowered to pay appellant, on her request, the difference between the income and $12,000. According to the agreement, at his widow's death or remarriage the corpus of the trust was to pass under Mr. Harrison's will.[2]

Mr. Harrison lived for more than a year after the marriage but never executed the new will. Thus, at his death (September 6, 1972), decedent had failed to comply with the requirement of the antenuptial agreement. Following probate of the 1968 will, the widow petitioned for the family exemption.[3]

The court refused to grant her petition because it concluded that despite decedent's failure to execute a new will, consideration for the agreement could now be supplied by acceptance of the executors' offer to set up a trust in the minimum dollar amounts recited in the agreement. The court reasoned that by failing to execute a will creating the trust, decedent had breached only a "technical requirement" of the antenuptial agreement. This breach, the court held, could be "readily corrected by creating the trust now out of the corpus

---

[2] In the agreement Mr. Harrison promised to make other testamentary gifts to his future wife. None of these gifts are relevant to the instant controversy.

[3] See 20 Pa. S. §§3121-26 (Special Pamphlet 1972). The family exemption permits a decedent's spouse (or in certain cases children or parents) to retain or claim as exempt from disposition by the decedent, property to the value of $1,500. Id. § 3121.

of his estate . . . ." *Harrison Estate,* 96 Montgomery County L. Rptr. 296, 299 (Pa. O.C. 1973).

We cannot agree. The promise to execute a new will was a material undertaking by decedent basic to the antenuptial agreement. Without performance of this promise, which only decedent himself could carry out, the antenuptial agreement may not serve to bar Mrs. Harrison from her family exemption. We reverse.[4]

An antenuptial agreement is more than an ordinary contract. As we noted in *Hillegass Estate,* 431 Pa. 144, 149, 244 A.2d 672, 675 (1968): "Parties to an Antenuptial Agreement providing for the disposition of their respective estates do not deal at arm's length, but stand in a relation of mutual confidence and trust that calls for the highest degree of good faith . . . ." Antenuptial agreements are instruments designed and executed for a particular purpose—to alter or extinguish a spouse's statutory rights of inheritance. It is true that by a valid antenuptial agreement either party may waive his or her right to the family exemption. Nevertheless, our courts will carefully examine the agreement to make certain that it reflects "the highest degree of good faith." See *Hillegass Estate,* supra; *Gelb Estate,* 425 Pa. 117, 228 A.2d 367 (1967). Before the release of such significant rights may be enforced, the bargain on which the release is based must be performed. Here, in the absence of the bargained-for performance—execution of a new will—the surviving spouse retains her right to the family exemption.[5]

---

[4] This Court has jurisdiction pursuant to the Appellate Court Jurisdiction Act of 1970, Act of July 31, 1970, P.L. 673, art. II, § 202(3), 17 P.S. § 211.202(3) (Supp. 1973).

[5] In other jurisdictions cases involving common-law dower have held that a surviving spouse need not accept substitute performance of an antenuptial agreement.

In *Sullings v. Sullings,* 91 Mass. (9 Allen) 234 (1864), a deceased husband's executors sought to compel his widow to waive

The law of Pennsylvania has always conferred upon a surviving spouse specific and substantial rights in the estate of a decedent;[6] the unchallenged policy of the Commonwealth has been to scrupulously protect these rights. In order for an inter vivos agreement, whether executed before or during marriage, to terminate these statutorily-conferred rights, our courts have required that the agreement be executed in good faith after full disclosure of the parties' financial condition or that the agreement provide a reasonable amount for the survivor. *Hillegass Estate,* supra at 150, 244 A.2d at 675; *Geld Estate,* supra at 122-23, 228 A.2d at 370; see *Kaufmann Estate,* 404 Pa. 131, 171 A.2d 48 (1961).

Indeed, this Court held in *Levine Estate,* 383 Pa. 354, 118 A.2d 741 (1955), that when a party to an antenuptial agreement fails to perform his promises, con-

---

dower by accepting their performance of an antenuptial agreement. However, the agreement required decedent to make certain inter vivos transfers. The Supreme Judicial Court of Massachusetts observed, "The question is, will equity compel her to adhere to a contract which has been broken by the other contracting party?" Id. at 238. The court held that because the husband had not performed the agreement, it could not bar the widow's right to dower.

In a similar situation, the Supreme Court of Tennessee commented: "It avails the defendants nothing, to say that the complainant might, in equity, have enforced a specific execution of the agreement, against the personal representative, as well as against the legatee under the will. This is doubtless so; but it is clear that, as the husband failed in his lifetime, to effectually execute the agreement on his part, the complainant was left to an election after his death, either to abide by and enforce a specific execution thereof, or to abandon it and claim her legal rights, as widow, in the estate of her husband, as if no such agreement had ever been made." *Woodward v. Woodward,* 37 Tenn. 49, 55-56 (1857). See also *Sheldon v. Bliss,* 8 N.Y. 31 (1853), aff'g 7 Barb. 152 (Sup. Ct. Oneida County 1849).

[6] See, e.g., Act of April 8, 1833, P. L. 315, §§1, 15 (statutory share in lieu of common-law dower); Act of April 14, 1851, P.L. 612, § 5 (family exemption).

sideration for the agreement fails, and the survivor may claim her statutory rights. The agreement there provided that Mrs. Levine would waive all rights in her husband's estate in return for his promise to leave her, by will, one-half of a checking account maintained in his name. Following her husband's death, the widow elected to take against the will even though it left her one-half of the account. This Court held that because half of the funds in the account were derived from property owned individually by Mrs. Levine, there was a failure of consideration.

"Since Flora Levine did not receive the consideration contemplated and bargained for in the agreement of December, 1949, she is released from any assumed obligation owing from her in that same agreement; and she is thus not barred from electing to take against her husband's will." 383 Pa. at 359, 118 A.2d at 743.[7]

Similarly, in *Mornes Estate,* 79 Pa. D. & C. 356 (O.C. Lawrence County 1951), the orphans' court held that the widow's attempt to take against the will was

---

[7] *Levine Estate,* 383 Pa. 354, 118 A.2d 741 (1955), also refutes appellees' contention that marriage itself, even when the other provisions of the antenuptial agreement remain unperformed, is sufficient consideration to prevent rescission of the agreement.

Undoubtedly, the impending marriage is the motivation for preparation of an antenuptial agreement. But we cannot accept appellees' theory that once the marriage is consummated, nonperformance of other terms may not render the agreement unenforceable. Cf. *Hillegass Estate,* 431 Pa. 144, 244 A.2d 672 (1968) ; *Gelb Estate,* 425 Pa. 117, 228 A.2d 367 (1967) ; *Emery Estate,* 362 Pa. 142, 66 A.2d 262 (1949). The execution of the agreement itself demonstrates that consideration in addition to marriage is what the parties bargained for. This is not a contract to marry. Here the parties executed the antenuptial agreement "in consideration of their contemplated marriage *and* of the mutual covenants and releases herein contained . . . ." (emphasis supplied).

Were we to accept appellees' contention, once two persons married, their antenuptial agreement would be enforceable even if neither performed any of the terms of the agreement.

not barred by an antenuptial agreement. In the agreement, Mr. Mornes promised to make a will leaving to his wife a life estate in that portion of his estate in excess of $6,000. Mrs. Mornes promised to make no claim against the first $6,000 of her husband's estate. During marriage the husband conveyed several thousand dollars worth of real estate to his bank to be held in trust for certain friends and relatives. Not until after his death was it discovered that Mr. Mornes had failed even to mention his widow in his will. The orphans' court held that because decedent had not made the agreed-upon testamentary provision for his wife, the widow should be permitted to take against the will.[8]

---

[8] *Friese's Estate*, 336 Pa. 241, 9 A.2d 401 (1939), relied upon by appellees, is not to the contrary. There the antenuptial agreement stated: " 'It is mutually understood and agreed between the said parties hereto that said Mary W. Portman, his proposed second wife, shall not claim any part of the estate of the said Charles A. O. Friese except *the amount* given to her by his Last Will and Testament . . . .' " 336 Pa. at 242, 9 A.2d at 401 (emphasis supplied). The agreement also provided that Mr. Friese would pay to Mary Portman $10,000 in money and securities. This transfer was made the day the agreement was signed.

This Court was not there presented with the question whether the widow could take against the will. The issue was whether Mrs. Friese could recover in damages the amount of a bequest to her in her husband's unsigned will. The Court held that she could not because the invalid will did not establish "the amount" to which Mrs. Friese was entitled.

This Court, in dictum, did say: "We are likewise impressed with the unfortunate result the law compels us to reach. But we cannot depart from the conclusions in Friese's Est., 317 Pa. 86, 91, that 'if it [the antenuptial agreement] is valid,' it bars the widow from 'any interest' in her husband's estate." 336 Pa. at 248, 9 A.2d at 404 (brackets in original).

However, the earlier *Friese's Estate*, 317 Pa. 86, 176 A. 225 (1934), held only that the widow need not be appointed administrator of the decedent's estate. The sole mention of any antenuptial agreement was the abstract observation that "[n]ot only does her antenuptial agreement, if it is valid, bar any interest, but if it is

Here, Mrs. Harrison promised by antenuptial agreement to relinquish her statutory rights in exchange for decedent's new will. When parties attempt by antenuptial agreement to surrender such significant rights our cases as well as compelling public policy considerations require full and exact performance of each provision of the agreement. Here, there has been no new will and, hence, no performance.

The executors assert that they can provide for appellant exactly what Mr. Harrison would have if the promised new will had been executed. We cannot accept this argument. Although the antenuptial agreement speaks in amounts which appear to be reasonable these amounts are only the minimum which decedent might have provided had he executed a new will. We need not, as appellant urges, conclude that decedent's failure to make a new will evidences an intent that his wife take against his earlier will. However, Mrs. Harrison did bargain for her husband to provide for her in his new will at least the amount specified in the antenuptial agreement. She reasonably could have believed that if the marriage proved to be a happy one, he might have decided to give her more than the required minimums. Indeed, the agreement itself recognizes the possibility of gifts beyond the stated minimums by stipulating that each spouse "may voluntarily choose to make other provisions."[9] That the executors cannot now

invalid, she has a direct claim against the estate because of its invalidity." 317 Pa. at 91, 176 A. at 227. Because the widow had a claim against the estate, whether the agreement was held valid or invalid, the Court affirmed the orphans' court's refusal to appoint her administrator.

[9] The relevant clause reads: "Each party desires to enter into this marriage upon the basis that neither shall have any legal claim on the estate of the other, or to the detriment of the children of the other, except as provided in this Agreement and except to the extent that the other spouse may voluntarily choose to make other provisions."

know what decedent would have provided for his wife had he written the contemplated new will is obvious.

It must be concluded that decedent's promise to make a will is material consideration for appellant's promise to forego her statutory rights.[10] Here, as in *Levine* and *Mornes,* the widow may not be denied her statutory rights by an antenuptial agreement that has not been performed. We hold that in order for an antenuptial agreement to preclude the surviving spouse's statutory rights, promises made in the agreement must be fully and fairly performed. Here decedent failed to execute the will called for by the antenuptial agreement. This commitment was one that only Mr. Harrison could perform. The executors' offer of a trust is not the new will bargained for. In these circumstances, nothing less than actual performance by the husband can compel the wife's relinquishment of her family exemption.

The decree of the orphans' court is reversed. The case is remanded with directions that the court enter an appropriate decree granting the petition for the family exemption. Each party pay own costs.

---

[10] We are aware that the courts of other states have held the promise to make a new will not a material term of an antenuptial agreement. See *Estate of Johnson,* 202 Kan. 684, 452 P.2d 286 (1969) ; *Cantor v. Cantor,* 174 N.E.2d 304 (Ohio Prob. 1959). In each of these cases the court concluded that the promised execution of the will was not consideration but simply the means which the parties chose to effectuate the terms of the agreement.

Here, we believe that Mr. Harrison's promise to make a new will was material consideration for appellant's waiver of her statutory rights. She bargained for a will executed by her future husband, not the executors' present attempt at substitute performance. As we have stated, this Court will not permit the legislatively-granted rights of the surviving spouse to be defeated unless the decedent has in good faith fully performed the terms of the antenuptial agreement.