In re: Joseph O'BRIEN, Deceased

Eileen N. O'Brien, Appellee

v.

Ruth L. Collura, Executrix of the Estate of Joseph E. O'Brien, Deceased, Appellant.

Superior Court of Pennsylvania.

Argued Nov. 30, 2005.

Filed April 26, 2006.

Peter J. King, Pittsburgh, for appellant.

Robert J. Tate, Pittsburgh, for appellee.

BEFORE: LALLY–GREEN, TODD, and McCAFFERY, JJ.

OPINION BY McCAFFERY, J.:

¶ 1 Appellant, Ruth L. Collura, the daughter of decedent Joseph O'Brien and executrix of his will ("Daughter"), appeals from the trial court's order permitting Appellee, Eileen N. O'Brien, Joseph O'Brien's second wife, to claim a surviving spouse's share of her husband's estate. Specifically, Daughter asks us to determine whether the trial court erred in finding that the parties' postnuptial agreement was unenforceable because, *inter alia,* the underlying consideration had been destroyed, and Husband had failed to comply with the agreement's terms. After careful review of the evidence of record and applicable law, we hold that the trial court acted properly in declaring the agreement unenforceable; thus, we affirm.

¶ 2 The evidence of record revealed the following course of events leading up to this case. Eileen ("Wife") and Joseph O'Brien ("Husband") were married in 1986, both having been previously married. In 1992, the couple moved into a retirement community. Five years later, on November 19, 1997, they executed a postnuptial agreement clearly intended to preserve each of their estates for the benefit of their respective children from their first marriages. The agreement provided as follows:

> WHEREAS, both the Husband and Wife are in the process of making new Wills, and in doing so, are both desirous that their intentions are carried out so that the ultimate recipients of their respective Estates are their family members from their first marriages and to effectuate their present intentions, the Husband is making a Will which will name his Wife as the income beneficiary

of his complete Estate, with the exception of a bequest of stock which will pass to the Husband's daughter, so that the income from the Husband's Estate will be paid to the Wife throughout the remainder of her lifetime, with the remainder interest in the Husband's Estate ultimately passing to the Husband's grandchildren. The Wife is also executing a Will whereby the Wife will leave her separate Estate to her family members from her first marriage; and

WHEREAS, both the Husband and Wife are completely familiar with the size and extent of the Estate of the other and the Husband has revealed to the Wife that his separate Estate has a value of approximately $1,000,000.00 and the Wife has revealed to the Husband that her separate Estate has a value of approximately $300,000.00; and

WHEREAS, both parties believe that this Agreement which they are signing is fair to both of them since, if the Husband should precede the Wife in death, the Wife will receive the benefit of the earnings on all of the Husband's assets, with the exception of the bequest previously mentioned which will go to the Husband's daughter, and this income will be sufficient to support the Wife in the style to which the parties have become accustomed throughout the term of their marriage. Further, the parties are the owners of a joint asset having a value of approximately $100,000.00, and if the Wife should survive the Husband, the Wife will have sufficient money from that asset to provide for the purchase of any item that she may need which may not be covered by the income that she will be receiving under the Trust being created under the Will that the Husband is presently signing.

FOR AND IN CONSIDERATION OF the mutual covenants of the parties, and with the intent of being legally bound hereby, the parties agree as follows:

1. Each of the parties will sign a Will that is being prepared for each of them and each of them have [sic] reviewed the Will of the other.

2. The Husband agrees to all of the provisions in the Will being made by the Wife and the Wife agrees to all of the provisions in the Will being made by the Husband. Each of the parties agree[s] that the Will being made by the other spouse is fair and equitable and is in total agreement with all of the provisions of the spouse's Will.

3. Each of the parties renounce[s] their [sic] right to elect to file a claim against the Will of the other spouse and this document shall be a sufficient waiver of that right[ ] by each of them to take against the Will of the other spouse. Also, each of the parties are [sic] waiving any intestate right that they [sic] may have in the Estate of the other spouse and agree[s] to abide by the terms of the Will being signed by the other spouse.

(Postnuptial Agreement, dated 11/19/97, at 1–2 ("Agreement"); Exhibit A of Petition for Citation to Executrix to Show Cause).

¶ 3 On that same date, November 19, 1997, Husband executed a will that, among other things, bequeathed to Daughter all of his stock in Coca–Cola, granted the residue of his estate to Wife and Daughter as co-trustees, and directed that the income from the estate be paid to Wife during her life, as well as "so much principal as the co-trustee [Daughter], in her sole discretion, deems advisable for the health, maintenance and comfortable support of [Wife]." (Last Will and Testament, dated 11/19/97, at 2 ("Original Will"); Exhibit B of Petition for Citation to Executrix to Show Cause).

¶ 4 As recited by the trial court in its opinion, trouble among the parties began to brew in mid–1999.[1] On July 25, 1999, Daughter and her spouse visited Husband for lunch and determined that Husband should move in with Daughter in order to "fatten him up." (Trial Court Opinion, dated September 1, 2004, at 3). Daughter took Husband home with her on that very afternoon. The trial court noted that despite Daughter's insistence that the move was intended to be temporary, Husband's and Daughter's actions in the days that followed suggested otherwise.

¶ 5 On the day after Husband made his "unannounced departure from the marital residence," he traveled with Daughter to the post office and changed his address to Daughter's home. (*Id.*) The pair then went to the Mars National Bank, where Husband withdrew $25,000.00 from an account he held jointly with Wife. Thereafter, Husband and Daughter visited the retirement community and informed its president that Husband was going to stay with Daughter, despite the president's suggestion that the facility could tend to Husband's medical needs through its continuing care program. (*Id.* at 3–4). The final stop for Husband and Daughter that day was at the National City Bank, where Husband deposited $25,000.00 into a new, joint account he opened with Daughter. (*Id.* at 4).

¶ 6 In addition to the actions described above, Husband also sent a letter to the Mars National Bank, informing them that he was ill and could not leave his residence, which he listed as Daughter's address. Husband instructed the bank to send him a check in an amount equal to the value of a certificate of deposit held jointly by Husband and Wife. The bank complied with Husband's request and sent him a check for $11,583.00. (*Id.*)

¶ 7 On August 3, 1999, about one week after Husband had moved out of the marital residence, he returned with Daughter and her spouse to have lunch with Wife. At that time, Husband learned that Wife had changed the locks on their apartment. This triggered an argument among the parties that ended with Husband removing his personal files from the couple's apartment.

¶ 8 Two days later, on August 5, 1999, Husband deposited $63,573.09 into his National City account. Apparently, these funds were the proceeds from the sale of a mutual fund ("Fund"), which fund was the joint asset described in the Agreement as having a value of $100,000.00. According to the trial court's opinion, Husband claimed that he did not request a payout of the Fund. Rather, he claimed that "the shares were 'called in' by the Corporation." (*Id.* at 5). At some point, Husband sent Wife a check for $31,000.00, representing her share of the Fund, but he did not explain to her the source of the check.

¶ 9 On August 6, 1999, Husband informed Wife that he had revoked her designation as his Power of Attorney. In September of that year, Wife sought and was granted spousal support from Husband, from which order Husband did not appeal.

¶ 10 In April 2000, Husband executed a new will (the "Second Will") and in November 2000, he executed another will (the "Third Will"). Both wills continued to provide Wife with a life estate as income beneficiary, but both made other changes from the terms of the Original Will. Wife filed for divorce in June 2000, and in Janu-

---

1. As we note *infra,* the certified record in this case does not contain a transcript from the trial court proceedings. In the absence of same, we have relied on the trial court opinion in our recitation of the facts.

ary 2001, Husband filed a counterclaim, seeking an annulment.

¶ 11 On October 22, 2001, Husband died. As of that date, no further action had been taken in the divorce/annulment proceeding. In January 2002, Wife began the instant action against Daughter (as Executrix) by filing an Election Against Will and Conveyances, in which Wife sought to receive an elective share of Husband's estate under the Probate, Estates and Fiduciaries Code of Pennsylvania ("PEF Code"), 20 Pa.C.S.A. § 2203. Daughter challenged Wife's right under the PEF Code, relying on the Agreement to assert that Wife had explicitly agreed not to seek an elective share of Husband's estate.[2]

¶ 12 Following a bench trial in March 2004, the trial court found that Wife was entitled to seek an elective share of Husband's estate despite the existence of the Agreement. In an Opinion dated September 1, 2004, the trial court concluded that the Agreement was not binding on Wife because Husband had 1) liquidated the $100,000.00 asset referred to in the Agreement and 2) revoked the Original Will. The court reasoned that because the existence of both the asset and the Original Will formed the basis for Wife's promise not to seek an elective share, Husband's acts constituted a breach of the Agreement, and Daughter was precluded from seeking to enforce the Agreement against Wife.

¶ 13 Daughter filed exceptions to the trial court's order, which the court denied. This timely appeal followed and the matter is now ripe for our review.

¶ 14 In her brief, Daughter purports to set out three issues, but actually raises four. We have renumbered them accordingly:

1. Whether the Orphans' Court erred as a matter of law when it concluded that liquidation of [Wife and Husband's] joint asset destroyed the consideration for their postnuptial agreement when preservation of that joint asset was not the basis of any bargained-for exchange?

2. Alternatively, even assuming, *arguendo,* that the Agreement contained a mutual promise that the [p]arties would preserve the joint asset, whether the Orphans' Court erred as a matter of law when it concluded that liquidation of that joint asset destroyed consideration for the [p]arties' postnuptial agreement when [Wife's] failure to object to the liquidation and her acceptance of the liquidated proceeds constituted her ratification of the practical impossibility of performance of the postnuptial agreement and demonstrated her intention to be bound by the consequences of the liquidation?

3. Whether the Orphans' Court erred as a matter of law when it concluded that [Husband's] revocation of his [Original] Will resulted in a failure of the consideration of the [p]arties' Agreement when nothing prohibited [Husband] from revoking, and, at the time of his death, [Husband] had a valid will that named [Wife] his income beneficiary pursuant to the terms of that Agreement?

4. Whether the Orphans' Court erred as a matter of law when it concluded that [Husband] failed to perform the terms of the postnuptial agreement, consideration failed, and that [Wife] should

---

2. Daughter also claimed that Wife had deserted Husband for more than one year prior to his death, thereby precluding her from taking an elective share under 20 Pa.C.S.A. § 2106(a). The trial court specifically found that Wife had not deserted Husband, but that, instead, Husband had "clearly deserted" Wife. (Trial Court Opinion at 10). Daughter does not challenge this finding on appeal.

not be bound by the terms of the Agreement when it based its conclusions on clearly inapplicable rules of law?

(Daughter's Brief at 4).

¶ 15 The issue in this case is a question of law, making our "standard of review ... de novo and our scope of review ... plenary." *Stoner v. Stoner*, 572 Pa. 665, 667, 819 A.2d 529, 530 n. 1 (2003). While we are bound by the facts that are found by the trial court and adequately supported in the record, we are not bound by the trial court's conclusions of law. *Porreco v. Porreco*, 571 Pa. 61, 67, 811 A.2d 566, 569 (2002). The applicable standard for assessing prenuptial agreements applies equally to postnuptial agreements. *Stoner, supra*, at 672, 819 A.2d at 533, n. 5. That standard is as follows:

> The starting point for assessing the merit of any challenge to the validity of a prenuptial agreement is our decision in *Simeone [v. Simeone*, 525 Pa. 392, 581 A.2d 162 (1990) ]. In that opinion, we reevaluated our criteria for enforcing prenuptial agreements and rejected the paternalistic assumption in our caselaw that courts must scrutinize these agreements and refuse to enforce those that failed to make a reasonable provision for the other spouse. As we stated in *Simeone*, "[s]uch decisions rested upon a belief that spouses are of unequal status and that women are not knowledgeable enough to understand the nature of contracts that they enter." *Simeone*, 525 Pa. at 399, 581 A.2d at 165. Instead, we placed prenuptial agreements on the same general footing as other contracts, to be enforced pursuant to the well-settled principles of contract law: "[p]renuptial agreements are contracts, and, as such, should be evaluated under the same criteria as are applicable to other types of contracts." *Id.* at 400, 581 A.2d at 165.

In reorienting our standards for enforcing prenuptial agreements to the traditional principles of contract law, however, we did not lose sight of the fact that parties to these agreements do not necessarily deal with each other at arm's length. Accordingly, we reaffirmed "the longstanding principle that a full and fair disclosure of the financial positions of the parties is required." *Id.* at 402, 581 A.2d at 167. "Absent this disclosure, a material misrepresentation in the inducement for entering a prenuptial agreement may be asserted." *Id.* (citing *Hillegass' Estate*, 431 Pa. 144, 152–53, 244 A.2d 672, 676–77 (1968)). Thus, despite the prevailing theme in *Simeone* that the provisions of prenuptial agreements should be subject to no greater scrutiny than ordinary business contracts, we nevertheless continued the principle from our previous decisions that these agreements will only be enforced where the parties make a "full and fair" disclosure. In addition to preserving this vestige of our common-law caution towards the enforcement of prenuptial agreements, we affirmed that these agreements may be invalidated when fraudulently procured.

*Porreco, supra*, at 68–69, 811 A.2d at 569–70.

¶ 16 In invalidating the Agreement in the case *sub judice*, the trial court did not find that Husband had failed to make a full and fair disclosure of assets, nor did it find that the Agreement had been fraudulently procured. Rather, the court concluded that Husband had not performed pursuant to the terms of the Agreement, that consideration for the Agreement had failed through the actions of Husband, and that, as a result, Wife could not be bound by the Agreement's terms. (Trial Court Opinion at 12). Our review of the record and the law compels us to agree.

¶ 17 In her first claim, Daughter insists that Husband's liquidation of the $100,000.00 asset referred to in the Agreement did not constitute the destruction of consideration for the Agreement because the asset was not the basis for the parties' bargained-for exchange. We summarily reject this claim. The plain language of the Agreement clearly establishes that the existence of the asset, and Wife's access to it after Husband's death, was an integral part of the Agreement's terms.

¶ 18 The Agreement provided that "both parties believe[d] that the Agreement ... [was] fair" since, in addition to Husband's grant of a life estate to Wife, the parties were the owners of "a joint asset having a value of approximately $100,000.00 and if the Wife should survive the Husband, the Wife will have sufficient money from that asset to provide for the purchase of any item that she may need which may not be covered by the income that she will be receiving." (Agreement at 1–2). We determine that the trial court's conclusion that the asset in question was an essential component of the Agreement and constituted, in part, the consideration for the Agreement, was not erroneous.

■ ¶ 19 Daughter next claims that even if the asset was vital to the Agreement, Wife "ratified" Husband's liquidation of it when Husband sent her a check for half of the proceeds and she accepted the check without question or protest. Relying on *In re Estate of Long*, 419 Pa.Super. 389, 615 A.2d 421 (1992), Daughter asserts that Wife's acceptance of the proceeds demonstrated her intention to continue to be bound by the Agreement despite the liquidation.

¶ 20 In *Long*, a husband and wife entered into a prenuptial agreement not to seek a share of each other's estates. The agreement included the wife's promise to grant the husband a life estate in the property she owned. However, the wife failed to reveal to the husband that she was not the sole owner of the house at issue, and so had no authority to grant the life estate. At some point, while both parties were still living together, the wife and her daughter (the co-owner) sold the house and the wife kept her share of the proceeds. The husband and the wife moved into an apartment and the husband did not seek a portion of the wife's share of the proceeds, nor did he demand that the wife obtain another house. When the wife subsequently died, the husband sought an elective share of the wife's estate and her daughter contested it, relying on the couple's prenuptial agreement.

¶ 21 The *Long* court held that the prenuptial agreement remained valid because, although the wife's material misrepresentation about the ownership of the property made the agreement voidable under general contract principles, the husband's "failure to act when the misrepresentation was apparent amount[ed] to ratification of the agreement." *Id.* at 423.

¶ 22 The *Long* case is different from the one *sub judice* in two important respects. First, the conduct at issue in *Long* occurred while the parties were still together; indeed, the couple in *Long* never separated or initiated divorce proceedings. Second, the panel in *Long* relied primarily on record evidence of the husband's clear and long-standing knowledge that the house was not available to him since he and the wife moved out of the house together. In the case *sub judice*, the trial court concluded that although Wife received a check in connection with the liquidation of the Fund, "there was no indication [to her] that the joint asset had been cashed in." (Trial Court Opinion at 5).

■ ¶ 23 Daughter claims Wife had knowledge of the liquidation well before Husband's death, and refers to portions of

the transcript establishing same. However, the certified record does not include the trial transcript. It is an appellant's duty to insure that the certified record contains all documents necessary for appellate review.[3] *Commonwealth v. Little*, 879 A.2d 293, 301 (Pa.Super.), *appeal denied*, ——— Pa. ———, 890 A.2d 1057 (2005). Even if we were to conclude that *Long* did apply in this case, Daughter's reliance thereon would require that she establish Wife's clear knowledge of and acquiescence in Husband's acts, a fact the trial court did not find. In the absence of such proof, and for all of the reasons set forth above, we conclude that *Long* does not support Daughter's prayer for relief.

 ¶ 24 Daughter next asserts that the trial court erred in finding that Husband's revocation of the Original Will adversely affected the validity of the Agreement. Daughter claims that no provision in the Agreement prevented Husband from revoking the Original Will, and that so long as Husband provided Wife a life estate as income beneficiary, his subsequent will(s) satisfied his obligations under the Agreement.

¶ 25 The trial court found that Wife had "bargained for the provisions contained in [Husband's Original Will]." (Trial Court Opinion at 11–12). This finding is amply supported by the plain language of the Agreement, which provided that:

> Each of the parties will sign a Will that is being prepared for each of them and each of them have [sic] reviewed the Will of the other ... [and] the Husband agrees to all of the provisions in the Will

being made by the Wife and the Wife agrees to all of the provisions in the Will being made by the Husband.

> \* \* \* \* \* \*

> Each of the parties agree[s] that the Will being made by the other spouse is fair and equitable and is in total agreement with all of the provisions of the spouse's Will.

(Agreement at 2).

¶ 26 Daughter's argument on this issue is similar to that presented in her fourth and final claim. Essentially, she argues that the trial court erred in finding that Husband was in breach of the Agreement, and that as a result of that breach, Wife could not be held to the Agreement's terms. We disagree.

¶ 27 Daughter finds fault with the trial court's reliance on *In re Harrison's Estate*, 456 Pa. 356, 319 A.2d 5 (1974), which the trial court cited for the proposition that Husband was bound by the Agreement to provide Wife with that which he promised in the Original Will. The *Harrison's Estate* court held that it would "not permit the legislatively-granted rights of the surviving spouse to be defeated unless the decedent has in good faith performed the terms of the antenuptial agreement." *Id.* at 364, 319 A.2d at 9, n. 10. Daughter asserts that *Harrison's Estate* is inapposite because in that case, the spouse failed completely to comply with the terms of the agreement between him and his wife, while in this case, Husband complied with the Agreement by continuing to name Wife as a lifetime income beneficiary.

---

**3.** While we are precluded from relying on it, we note that Daughter's reproduced record includes only excerpts and single pages from the relevant transcript. Those excerpts, in turn, contain contradictory statements by Wife regarding her precise knowledge of the liquidation. Wife at one point concedes she received a check from Husband for half of what he liquidated, (R.R. at 74a), although she stated that she did not approve of the liquidation. (R.R. at 73a). At another point, Wife testified that she did not know the source of the money she received. (R.R. at 74a). Thus, not only is the certified record incomplete on this issue, but what little Daughter offers by way of the reproduced record is ambiguous, at best.

¶ 28 While it is true that Husband's subsequent wills granted Wife a life interest as income beneficiary of Husband's estate, it is also true that the subsequent wills contained other terms that differed from the Original Will, which other terms worked to Wife's "detriment." (Trial Court Opinion at 12). Among other things, the Third Will deleted Wife as co-trustee, changed the manner in which Wife was to receive income, did not provide for principal amounts to be paid to Wife if necessary for her health, and did not award Wife any tangible personal property. (*Compare* Original Will *with* Third Will; Exhibits B and D of Petition for Citation to Executrix to Show Cause).

¶ 29 Because the Agreement plainly sets out the parties' reliance on the Original Will, and because Husband revoked the Original Will and put in its place a will with different terms, we conclude that the trial court did not err in finding that Husband failed to abide by the terms of the Agreement. Accordingly, Husband's conduct precludes Daughter, as executrix of the estate, from prevailing in her contention that Wife remained bound by the Agreement.

¶ 30 Based on the facts as found by the trial court and the applicable law, we conclude that the trial court did not err in permitting Wife to take an elective share of Husband's estate. The Agreement restricting Wife from seeking an elective share was not binding, due to Husband's multiple breaches of the Agreement after the couple's separation. Accordingly, we affirm the trial court's order permitting Wife to claim a surviving spouse's share of her husband's estate.

¶ 31 Order affirmed.