398 A.2d 615

Estate of Edward L. FRIEDMAN, Deceased.

Beatrice FRIEDMAN, Appellant,

v.

Richard SCHOOLMAN.

Supreme Court of Pennsylvania.

Argued April 13, 1978.

Decided Nov. 18, 1978.

Reargument Denied March 20, 1979.

Dissenting Opinion May 9, 1979.
See 400 A.2d 590.

Stephen M. Feldman, Philadelphia, for appellant.

R. Stuart Jenkins, Media, Robert G. Lovett, Robert W. Watson, Jr., Reed, Smith, Shaw & McClay, Pittsburgh, Robert P. Lightcap, Lightcap, McDonald & Moore, Latrobe, for appellee.

Before EAGEN, C. J., and O'BRIEN, ROBERTS, POM-
EROY, NIX and LARSEN, JJ.

OPINION

POMEROY, Justice.

Edward L. Friedman married appellant Beatrice Kamile
Friedman on December 7, 1973. It was the second marriage
for each, and they entered into an antenuptial agreement on
the day of their wedding in which each renounced any
interest in the estate of the other. Eleven days later Ed-
ward died, leaving a will executed in 1967, under which
Beatrice takes nothing. In the court below Beatrice at-
tacked the validity of the antenuptial agreement and assert-
ed a breach by Edward of an oral contract to bequeath
practically all of his estate to her. The orphans' court
upheld the antenuptial agreement and declined to find that
a contract to make a will had been entered into. We affirm.

The procedural background is this. After Edward's 1967
will was admitted to probate, appellant filed a petition in
the orphans' court division in March 1975 alleging that the
antenuptial agreement was invalid and claiming her widow's
share in his estate and the family exemption. The dece-
dent's sisters-in-law by his prior marriage, who were the
beneficiaries of his probated will, filed answers denying the
allegations. In August 1975 Beatrice commenced an action
in assumpsit against the executor of Edward's estate claim-
ing nearly all of the estate by reason of an alleged oral
contract to make a will. The executor took the position of a
stakeholder and the sisters-in-law (as residuary legatees
under the 1967 will) were permitted by stipulation of counsel
to intervene as parties defendant. The suits were consoli-
dated and tried without a jury as a proceeding in the
orphans' court division, and the court thereafter dismissed
the petition and entered a compulsory non-suit in favor of
the defendants in the assumpsit action. Exceptions to the
decree nisi were dismissed and a motion to take off the

non-suit was denied in a single decree, and these appeals followed.[1]

The issues raised here are, in essence, (1) whether the antenuptial agreement is valid; (2) whether modification of decedent's 1967 will by operation of law, so as to entitle appellant to her intestate share of the estate, is barred by the terms of the agreement; (3) whether the lower court erred in entering the non-suit in the assumpsit action; and (4) whether the court erred in holding that claimant was incompetent to testify. Resolution of these issues requires a rather detailed recitation of the evidence, to which we now turn. The legal questions are discussed thereafter.

## I.

Edward Friedman's first wife died in 1965; there were no children of that marriage. Beatrice's first husband died in 1967; two children were born of that marriage. At the time of their marriage, Edward was 71 years of age and Beatrice 58. As stated above, Edward lived only eleven days thereafter. Both Edward and Beatrice possessed substantial estates at the time of their marriage; statements appended to their antenuptial agreement indicated that Edward was worth at least $532,000, while Beatrice had assets of at least $300,000.[2]

The salient testimony in this case came from Gene E. McDonald, Esquire, who drafted the antenuptial agreement in issue and the proposed wills for Edward and Beatrice.

1. An appeal from the dismissal of the petition was lodged in this Court pursuant to Section 202(3) of the Appellate Court Jurisdiction Act of July 31, 1970, P.L. 673, No. 223, art. II,, 17 P.S. § 211.202(3) (Supp.1978), since superseded by Section 722(3) of the Judicial Code, 42 Pa.C.S. § 722(3) (effective June 27, 1978). An appeal from the order as it related to the assumpsit action was taken to the Superior Court, and was later certified here and consolidated.

2. In these statements, Edward and Beatrice listed the nature and number of their holdings of common and preferred stocks, but neither listed the value of these securities as of the date of the agreement. The inventory of Edward's estate, as filed by his executor, indicates that the value of the stocks owned by him at the time of his death was about $220,000.

His testimony may be summarized as follows. On Friday evening, November 30, 1973, McDonald received a telephone call at his home in Latrobe from Edward Friedman, a neighbor whom he had represented from time to time over the years. Edward stated that he intended to remarry on Thursday, December 6, and asked whether, in view of his discussions with his prospective wife concerning property matters, McDonald could meet with them on Sunday, December 2. McDonald went to the Friedman home on that day and met with both Edward and Beatrice for about two hours. No one else was present.

McDonald described the nature of their conversation as follows:

". . . [W]e did get into the actual discussion of what a Pre-Marital Agreement was, what it meant, as I understood the laws and cases of Pennsylvania. I indicated the difficulty of drawing a Pre-Marital agreement which in my opinion would be valid stressing to Ed primarily . . the absolute necessity of making a complete and detailed disclosure of all the assets that he owned. This took some time in order to be sure in my mind that Ed understood that it had to be in complete detail . . . . In these discussions I learned that he and [Beatrice] prior to my visit apparently had been discussing their desires as to property, subsequent to the marriage and that Ed had some knowledge of the assets which [Beatrice] had. I then explained to Ed and [Beatrice] what would happen to her interest . . . in [certain] real estate in the event of marriage and in the event she should die prior to Ed having died. In these discussions then [Beatrice] further indicated other assets which at least led me to believe that these assets would be substantial . . . . After what I would call a give and take conversation among the three of us, as to the ramifications of the marriage, what effect it would have on each of the other's property, it was Ed's desire that they have a Pre-Marital Agreement. He wanted no interest in Mrs. Friedman's property and he indicated that he wanted his property, if the marriage

were existing at the time of his death to go substantially to [Beatrice].

\* \* \* \* \* \*

". . . [A]nd then I said to Ed it seems to me that what we are now talking about is an estate plan because, and I explained then in some brief detail some of the possible tax consequences that could occur in the event that Mr. Friedman did, in fact, make a will leaving everything substantially to [Beatrice] without any trust provisions . . . I recommended then that he make a Will providing . . . the normal form of a marital deduction trust . . . Both he and [Beatrice] seemed to understand—not seemed, but understood what I was saying . . . .

\* \* \* \* \* \*

"Q. . . . [W]as there any discussion at that meeting with regard to what would happen to the property . . . in the event their marriage was dissolved or terminated by divorce?

\* \* \* \* \* \*

"A. . . . This discussion, this was really Mr. Friedman's real concern, not concern that the marriage was going to be dissolved, but as he would say, God forbid, but if this dear woman and I were not able to get along I want to have control of my personal property; and [Beatrice] said well in effect—words to the effect, we are in agreement of [sic] that, that if the marriage is dissolved we want control over our own property, but if the marriage is subsisting at the time of my death, Ed Friedman says, then I want [Beatrice] to have the property as I have described it in this testimony."

Beatrice also expressed a desire to make a will under which her estate would be divided between her two children. Edward would serve as executor but would receive nothing under the will. Beatrice also gave McDonald the names of two attorneys in Illinois who could aid in describing her assets; one was a relative of hers who prepared her income

tax returns. McDonald then explained that because of his schedule (which, as it happened, included an unrelated business trip to Chicago in two days) it would be impossible for him to draft the agreement and the wills by Thursday, and consequently the couple agreed to postpone their wedding one day.

The draft will which attorney McDonald prepared for Edward, as he described it, included three legacies of $5,000 each for two nephews and a niece. Approximately fifty percent of the estate was then placed in a so-called marital deduction trust for federal tax purposes, from which appellant would receive the income for life, with a right to take down principal as desired. Upon her death the balance of principal would go to such persons as she might appoint under a general testamentary power of appointment. The residue of the estate was also to go in trust to pay income to appellant for her life, with the remainder to her children outright.[3]

After doing some legal research on the case on Monday, December 3, McDonald went to Chicago on Tuesday, December 4, and received some information from Beatrice's attorney there; he also called Edward and asked that additional information concerning Beatrice's assets, along with Edward's list of his own assets, be delivered to McDonald's office. The next day, McDonald dictated at his office the antenuptial agreement and the drafts of wills for Edward and Beatrice. After another out-of-town business trip on Thursday, McDonald returned to Latrobe that night and reviewed the typed documents. The lists of assets had been delivered in the meantime and were also reviewed by McDonald on Thursday night.

All was apparently in order when Edward and Beatrice arrived at McDonald's office on Friday morning to review and sign the agreement and wills. The meeting lasted about a half an hour and was described by McDonald as follows:

3. Under both trusts, the trustee was accorded discretion to pay principal to appellant if the income was "insufficient to provide adequately for the welfare and comfortable support of my wife."

"The documents, the Pre-Martial Agreement and the Wills, each of the Wills had been laid on my desk to the right side of it, and I gave to Ed Friedman who sat opposite the desk, a copy of the Pre-Marital Agreement. Mrs. Friedman was seated to my right. I had a curved desk so that as she sat at that end of the desk, the copy which was left on the desk was one that she could review.

\* \* \* \* \* \*

"Q   And can you describe what, if anything, you did by way of telling them what was in the Agreement?

"A   Mr. Friedman had a copy of the Agreement in his hands, Mrs. Friedman was sitting to my right a copy available for her to review and follow.  I went down the Agreement through the Preamble and then paragraph by paragraph and said this is what this paragraph says and means, rather than reading it verbatim."

When the review of the antenuptial agreement was completed, but before any document was signed, McDonald turned to the wills, first reviewing Beatrice's will.  Following this, he summarized Edward's will, and at this point Edward raised a question regarding the three $5,000 legacies to his two nephews and his niece.  "He expressed an opinion that he really didn't owe them anything" and stated that "he might want to leave those legacies" to his sisters-in-law (the residuary legatees under the 1967 will).  This, said McDonald, "was not a firm statement.  [The] [i]ndication was he wanted to give it some consideration."  Because it would be impossible to redraft the will for signing before Edward and Beatrice were to leave for their wedding later that morning, McDonald (after ascertaining that the couple would remain in Latrobe after the wedding) suggested that the antenuptial agreement only be signed, and that the drafts of the wills and copies of the agreement be delivered to the Friedman home on Saturday.  In this way "after review Mr. Friedman could then call me and we would either sign the will as prepared or if there were any changes to be made we could make them."  This suggestion was

agreed to by the couple. Duplicate copies of the antenuptial agreement were then signed and witnessed.

On Saturday night, December 8, McDonald delivered the agreement and the wills to Edward at home. There was no conversation concerning the substance of any of the documents. McDonald's next contact with the Friedmans was on Wednesday, December 12, when Edward telephoned "to decide upon a time when we could meet and discuss the Wills and any changes Ed might want to make." A meeting was arranged and held on Friday, December 14, one week after the wedding, at the Friedman home. At this meeting, which lasted about an hour, Edward, Beatrice, and McDonald were, as before, the only persons present. The central topic was Edward's will, and he directed two changes therein. First, the specific bequests were to go to his sisters-in-law. Second, the will was to provide that if Beatrice predeceased him, Edward's estate was to be divided equally between his sisters-in-law and Beatrice's children. No other changes were to be made, and Edward "was just as specific as he had been before, that if [Beatrice] were in fact living at the time of his death he wanted her to have his estate and in the same way that we had set it up as a result of the December 2nd meeting. . . ."

McDonald dictated these changes on Friday afternoon and the revised draft was typed on Monday, December 17. Edward Friedman never saw this new document, however, because he died on Tuesday, December 18. He had signed neither of the two wills prepared for him by McDonald during the preceding two weeks. The will of decedent which was admitted to probate was, as noted above, one which he had made in 1967.

## II.

We shall consider first the antenuptial agreement, and particularly appellant's attack on its validity. The portions of the agreement relevant to this phase of the case are as follows:

"WHEREAS, Edward and Beatrice intend to be married; and,

"WHEREAS, Edward is the owner of interest in real estate and the owner of personal property, each of substantial value, and which has been fully disclosed to Beatrice and is listed and contained in the schedule attached hereto, made a part hereof and marked Exhibit "A"; and,

"WHEREAS, Beatrice is the owner of interest in real estate and the owner of personal property, each of substantial value, and which has been fully disclosed to Edward and is listed and contained in the schedule attached hereto, made a part hereof and marked Exhibit "B"; and,

"WHEREAS, Edward and Beatrice desire to keep the property now owned or real estate acquired by each, free from any claims that the other may acquire by reason of the marriage or by the survival of the other party, except as provided otherwise in this Agreement; and,

"WHEREAS, Edward desires and agrees to accept the provisions of this Agreement in lieu of all marital rights either as husband, widower, heir or next of kin upon the death of Beatrice; and,

"WHEREAS, Beatrice desires and agrees to accept the provisions of this Agreement in lieu of all marital rights either as wife, widow, heir or next of kin upon the death of Edward.

"Edward and Beatrice, in consideration of the mutual promises, covenants and obligations, do hereby agree as follows:

"1. Edward does hereby waive, discharge and release any and all right, title or interest whatsoever which he may acquire in the property, now owned or acquired by Beatrice, by reason of their marriage.

"2. Beatrice does hereby waive, discharge and release any and all right, title or interest whatsoever which she may acquire in the property, now owned or acquired by Edward, by reason of their marriage.

"3. Edward and Beatrice each waives, discharges and releases any and all claims and rights that each may acquire by reason of their marriage:

3.1  To share in the estate of the other upon the death of one of them either by way of dower, widow's interest or allowance, widower's interest or allowance, statutory allowance of distribution in intestacy;  and

3.2  To elect to take against the Will of the other;  and

3.3  To act as executor or personal representative in the estate of the first of them to die other than as specifically stated in the Last Will and Testament of the first of them to die.

3.4  To share in any way in the property of each other including both real and personal, in the event of separation or of the marriage being dissolved at any time in any manner other than by death.

"4.  In the event that Beatrice predeceases Edward, then Edward shall receive no assets from the estate of Beatrice.

"5.  In the event that Edward predeceases Beatrice, then Beatrice shall receive no assets from the estate of Edward except those assets or interest in his estate which shall be devised to Beatrice in any Will which Edward shall make after the date of this Agreement.

"6.  Nothing contained in this Agreement shall be deemed to constitute a waiver by either Edward or Beatrice of any bequest, legacy or interest in an estate that may be left by one to the other.  The parties acknowledge that no promises have been made by either of them to the other with respect to any such bequest or legacy except as herein specifically provided."

■  A reading of these provisions suffices to dispose of appellant's contention that if the agreement is valid, its terms do not bar her from claiming half the estate of her husband on the theory that the 1967 will was modified by operation of law.[4]

4.  Section 2507(3) of the Probate, Estates and Fiduciaries Code, 20 Pa.C.S. § 2507(3) (1975) provides in pertinent part: "If the testator marries after making a will, the surviving spouse shall receive the share of the estate to which he would have been entitled had the testator died intestate  .  .  ."  Appellant concedes that one may waive this statutory entitlement, and it is quite clear, contrary to

■ Next to be considered is appellant's attack on the validity of the agreement. Although one purpose of antenuptial agreements is to foreclose litigation, there have been many cases in which the validity of such contracts has been contested. In *Hillegass Estate*, 431 Pa. 144, 149–51, 244 A.2d 672, 675–76 (1968), the pertinent principles for determining the validity of antenuptial agreements were restated by this Court as follows:

"Parties to an Antenuptial Agreement providing for the disposition of their respective estates do not deal at arm's length, but stand in a relation of mutual confidence and trust that calls for the highest degree of good faith and a reasonable provision for the surviving spouse, *or* in the absence of such a provision a full and fair disclosure of all pertinent facts and circumstances. *Gelb Estate*, 425 Pa. 117, 123, 228 A.2d 367; *Kaufmann Estate*, 404 Pa. 131, 136, 171 A.2d 48; *McClellan Estate*, 365 Pa. 401, 407, 75 A.2d 595; *Whitmer's Estate*, 224 Pa. 413, 73 A. 551.

"However, it is too often forgotten that one of the two principal purposes of an Antenuptial Agreement is to change the provisions which the statutory law of Pennsylvania makes for a surviving spouse. *Emery Estate*, 362 Pa. 142, 147, 66 A.2d 262.

"(1) An Antenuptial Agreement is presumptively valid and binding upon the parties thereto.

"(2) *The person seeking to nullify* or avoid or circumvent the Agreement has the burden of proving the invalidity of the Agreement by clear and convincing evidence that the deceased spouse at the time of the Agreement made *neither* (a) *a reasonable provision for the intended spouse, nor* (b) *a full and fair disclosure* of his (or her)

appellant's argument, that the waivers contained in the agreement foreclose appellant's statutory share. See, *e. g.*, *Holwig Estate*, 348 Pa. 71, 33 A.2d 915 (1943), affirming 56 Dauph. 346 (O.C.1943). Appellant's attempt to construct an *inclusio unius est exclusio alterius* argument from paragraph 3.1 of the agreement is meritless.

Although a claim for the family exemption is not pressed in appellant's brief, it is prayed for in her conclusion thereto. This, too, is clearly waived by the express language of paragraph 3.1. See, *e. g.*, *Jackson Estate*, 33 Pa.D. & C.2d 402 (O.C. Montgomery Co. 1964).

worth. *Gelb's Estate*, 425 Pa. page 123, 228 A.2d 367, supra; *Kaufmann's Estate*, 404 Pa. page 136, 171 A.2d 48, supra; *McClellan's Estate*, 365 Pa. page 407, 75 A.2d 595, supra; *Emery's Estate*, 362 Pa. pages 142, 146, 66 A.2d 262, supra; *Snyder's Estate*, 375 Pa. 185, 188, 100 A.2d 67.

"(3) In evaluating the reasonableness of the provision for the survivor, such reasonableness must be determined *as of the time of the Agreement* and not by hindsight. *Gelb's Estate*, 425 Pa. page 123, 228 A.2d 367, supra; *Kaufmann's Estate*, 404 Pa. page 137, 171 A.2d 48, supra. *Reasonableness* will depend upon the totality of all the facts and circumstances *at the time of the Agreement*, including (a) the financial worth of the intended husband; (b) the financial status of the intended wife; (c) the age of the parties; (d) the number of children each has; (e) the intelligence of the parties; (f) whether the survivor aided in the accumulation of the wealth of the deceased spouse; and (g) the standard of living which the survivor had before marriage and could reasonably expect to have during marriage.

"(4) Full and fair disclosure does not require the disclosure of the *exact* amount of his or her property: *Kaufmann Estate*, 404 Pa. page 136, 171 A.2d 48, supra; *Emery Estate*, 362 Pa. page 146, 66 A.2d 262, supra; *Holwig Estate*, 348 Pa. 71, 74, 33 A.2d 915; *McCready's Estate*, 316 Pa. 246, 255, 175 A. 554.

"(5) Even where there is a valid Antenuptial Agreement, this does not prohibit subsequent inter vivos gifts and testamentary bequests to a surviving spouse." (Emphasis in the original.)

Because the agreement before us made no provision for appellant, appellant focuses her attention on whether there was a full and fair disclosure of assets by decedent. We agree with the court below that there was.[5] It is true, as appellant points out, that the value of Edward's common

---

5. In view of our disposition of this question, we need not consider whether, given appellant's own substantial estate, the absence of a provision for her was unreasonable. See *Lock Estate*, 431 Pa. 251, 254 n. 1, 244 A.2d 677, 678 n. 1 (1968).

and preferred stocks was not set out in the schedule of his assets attached to the agreement.[6] But the *exact* value of either prospective spouse's property is not required in order for the disclosure of that property to be full and fair. *Hillegass Estate, supra,* and cases cited therein. Here, there was a complete listing in the agreement of the stocks owned by decedent, and the total of the values assigned to the other assets disclosed was approximately $532,000. It is plain that appellant was on notice that Edward's estate was worth somewhat more than that. How much more is shown by the inventory filed by the executor of Edward's will in which all his assets, including the stocks, are valued at $612,303.45. Since the effective date of this valuation is but eleven days after the date of the contract, the values were sufficiently contemporaneous with the contract to allow the lower court to take the inventory into account in deciding whether appellant had sustained her burden of showing by clear and convincing evidence that the disclosure was insufficient. See *Vallish Estate,* 431 Pa. 88, 94, 97, 244 A.2d 745, 748, 750 (1968). Given the complete listing in the agreement of what stocks were held by decedent, the discrepancy of less than 14% between the total value disclosed by the agreement and the total value disclosed by the inventory is not material.[7] Appellant's contention that the decedent's disclosure was not full and fair must fail.

A related argument by appellant is that the shortness of the meeting of the intended spouses and Edward's lawyer, Mr. McDonald, on the wedding day, together with the absence of independent counsel for appellant at each of the

6. As noted above, see note 2, *supra,* this was also the case with respect to appellant's disclosure of her stockholdings. Edward also placed no value on his interest on an orange grove in Israel on the ground that valuation at the time was impossible. This asset is valued at $35,000 in the inventory of Edward's estate.

7. This is plainly not a case in which decedent failed to set forth his assets in writing and grossly understated their total value. See *Vallish Estate, supra,* at 94, 244 A.2d at 748; *Gelb Estate,* 425 Pa. 117, 123–25, 228 A.2d 367 (1967) (assets worth at least twice the value orally estimated); *McClellan Estate,* 365 Pa. 401, 75 A.2d 595 (1950) (assets worth some four times stated value).

two meetings of the couple and Mr. McDonald, should invalidate the agreement as a matter of law. It is conceded that neither the presence of independent counsel nor a fixed period of time to review the agreement before signature is required by our cases. Appellant urges, however, that the factors noted above, in view of all the circumstances, should render the agreement invalid. We do not agree.

In essence, appellant is asking us to infer that she did not know what the agreement meant or the nature and extent of Edward's disclosure when she signed the agreement. As the lower court noted, neither party had seen the agreement as reduced to writing by McDonald before they met on the day of the wedding. But the inference we are asked by appellant to draw from this evidence is severely weakened by other evidence. McDonald's testimony, which was accepted by the court below, showed that appellant and decedent discussed the effect of marriage on their estates for about two hours in a "give and take conversation" five days before they executed the agreement; that appellant had two attorneys in Illinois who were familiar with her affairs and her interests; that McDonald insisted on a full disclosure by decedent, and that decedent understood these instructions; and that McDonald on the day of the wedding, while not reading the agreement verbatim, "went down the Agreement through the Preamble and then paragraph by paragraph and said this is what this paragraph says and means," and that a copy of the agreement was available for Beatrice to review and follow. In addition, as noted above, the evidence shows that the disclosure contained no material misrepresentations of the value of decedent's estate. In view of this evidence, most of which was part of appellant's own case, the lower court was unwilling to conclude that appellant had carried her burden of showing by clear and convincing evidence that the agreement was invalid. We will not disturb this conclusion, for "[i]t is not our task to try the case anew." *Ziel Estate*, 467 Pa. 531, 537, 359 A.2d 728, 731 (1976). Whether appellant was overreached, given the circumstances of this case, is a question of ultimate fact.

And although it is true that "deductions or inferences made by the court below may be set aside if they lack evidential support," *Girsh Trust,* 410 Pa. 455, 467, 189 A.2d 852 (1963) (citations omitted), where, as here, the lower court's view of the evidence has ample support in the record, we will not disturb it. See, *e. g., Klein Estate,* 474 Pa. 416, 426, 378 A.2d 1182, 1187 (1977); *Girsh Trust, supra.*[8]

Appellant next contends that the agreement is invalid by reason of what she calls "constructive fraud." The evidentiary basis of this claim is that McDonald explained to the couple on December 2 that the antenuptial agreement and the wills as explained by him pursuant to their conversation "would all fit together," interlocking his fingers for emphasis. Five days later, Edward indicated that he was unsure who should receive the specific legacies. Pursuant to McDonald's advice, Edward and Beatrice decided not to sign their proposed wills, but did sign the antenuptial agreement. Although Edward later instructed McDonald to make certain changes in the draft of his will, he died before he could execute the will prepared for him. McDonald also testified that when, on the wedding day, Edward decided not to sign the proposed will, McDonald did not specifically advise Beatrice that if she survived Edward she would receive nothing from his estate unless the will was signed.

It is not contended that any statement by Edward or McDonald was untrue. But appellant argues that Edward's decision not to sign the proposed will "rendered untrue and misleading the representations of December 2, that the documents would fit together and result in Mrs. Friedman's inheriting her husband's entire estate less $15,000." It is emphasized that Mrs. Friedman was not informed, prior to

8. The cases relied upon by appellant do not point to a contrary conclusion. In each of them there was a material misrepresentation of decedent's worth (*McClellan Estate, supra* note 7), or there was no indication that the spouse had the agreement or the decedent's worth explained to her (*Warner Estate,* 207 Pa. 580, 57 A. 35 (1904) (dictum)), or the claimant was illiterate (*Shea's Appeal,* 121 Pa. 302, 15 A. 629 (1888)), or there was some combination of these factors, none of which is present here.

signing the antenuptial agreement on December 7, "of the possible effect of doing so without Mr. Friedman's contemporaneous signing of his will." Appellant's Brief at 22–23. As we understand this argument, it is that appellant was led to believe that the agreement and the wills would stand or fall together, and that upon the change in Edward's thinking about the terms of the will and his sudden death, her expectations were shattered.

Appellant's claim of "constructive fraud," like her other claims, must be shown by clear and convincing evidence. See, e. g., *Vallish Estate, supra,* 431 Pa. at 97, 244 A.2d at 750; *Hillegass Estate, supra.* We agree with the court below that this *post hoc, ergo proctor hoc* argument does not satisfy that burden. Undoubtedly, the documents here were parts of an estate plan, but "constructive fraud" simply does not follow from the fact that one of the contemplated parts of the plan was not made operative.

There are two unstated minor premises in appellant's argument which we are unable to accept. The first premise is that appellant, despite her discussions with McDonald and his paragraph-by-paragraph explanation of the antenuptial agreement, was unaware that it was necessary for Edward's proposed will to be signed before she could acquire any interest in his property upon his death. There is no basis for such an assumption. Second, it must be assumed that there was an enforceable obligation upon Edward to provide for claimant in his will. But the wills as drafted, even had they been signed, contained nothing that would bar revocation. See *Imbruglia Estate,* 479 Pa. 95, 387 A.2d 851 (1978); *Kester Estate,* 477 Pa. 243, 383 A.2d 914 (1978). Moreover, there was no "clear and convincing" evidence of any promise to leave anything, let alone practically the entire estate, to appellant;[9] indeed, the provisions for the residue of the estate in Edward's proposed wills, noted above, are to the contrary.

**9.** It will be recalled that although Beatrice was the primary beneficiary under the draft wills prepared by McDonald, it was also the lawyer's testimony that each spouse wanted control of his or her own property if they "could not get along" together.

Another principal roadblock to the conclusion that appellant would have us draw is the language of the agreement itself:

"5. In the event that Edward predeceases Beatrice, then Beatrice shall receive no assets from the estate of Edward except those assets or interest in his estate which shall be devised to Beatrice in any Will which Edward shall make after the date of this Agreement.

6. . . . The parties acknowledge that no promises have been made by either of them to the other with respect to any such bequest or legacy except as herein specifically provided."

In addition, McDonald testified as follows:

"Q. . . . At the meeting of December 7th, did either Mr. or Mrs. Friedman say or otherwise indicate that in signing the Pre-Nuptial Agreement its effectiveness was conditioned upon the signing of the drafts of the Wills you had prepared?

[objection and ruling omitted]

A. Neither Mr. Friedman nor Mrs. Friedman indicated that the signing of the Pre-Nuptial Agreement was conditioned upon the signing of the Wills."

Thus, even assuming that parol evidence could be heard to vary the plain meaning of the agreement, that there was no condition precedent to the waivers contained therein,[10] there was no "clear and convincing" evidence that the changes in circumstances amounted to rendering untrue the statement that had been made by McDonald concerning the relationship of the agreement to the wills, thus giving rise to a duty of further disclosure. Appellant's "constructive fraud" argument is without merit.

## III.

We turn to appellant's second cause of action, in which it is contended that appellant and decedent entered into a

10. But cf., e. g., *Scott v. Bryn Mawr Arms, Inc.*, 454 Pa. 304, 312 A.2d 592 (1973); *McMinn v. Mammone*, 169 Pa.Super. 1, 82 A.2d 70 (1951); Restatement (Second) of Contracts § 242(2)(b), comment *e* (Tent. Draft No. 6, 1971).

binding oral contract whereby decedent promised to leave his entire estate, less $15,000 in specific legacies, to her.

Appellant's first contention is that the existence of this contract was admitted in the answers of the estate and the intervenors to appellant's complaint in assumpsit. In support of this argument, appellant notes that the answers filed by the executor and two of the three intervenors were verified by their respective attorneys,[11] and that prior to the date on which these verifications were made, these attorneys had attended a deposition of McDonald taken on appellant's behalf. The answers of these parties all denied the material factual allegations in appellant's complaint on the ground that, after reasonable investigation, they were without knowledge or information sufficient to form a belief as to the truth of the averments. Appellant contends that in light of the depositions, these denials should be disregarded as patently false, thus causing the allegations of appellant's complaint to be deemed admitted.

Our procedural rule relevant to this argument is Pa.R. Civ.P. 1029, which reads in pertinent part:

"(b) Averments in a pleading to which a responsive pleading is required are admitted when not denied specifically or by necessary implication. A general denial or a demand for proof, except as provided by subdivision (c) of this rule, shall have the effect of an admission.

"(c) An averment shall be deemed to be denied if proof thereof is demanded and the pleader states . . . (1) that after reasonable investigation he is without knowledge or information sufficient to form a belief as to the truth of the averment . . . . The pleader shall not be required to state what investigation he has made or to rely upon information received from an adverse party or hostile person."

We agree with the court below that the defendants' denials were sufficient. This is not a case in which a party does not bother to ascertain a matter of public record, *Strank v.*

11. See Pa.R.Civ.P. 1024(c)(2).

634

*Mercy Hospital of Johnstown*, 376 Pa. 305, 308, 102 A.2d 170 (1954), or in which he asserts lack of knowledge of a matter in which he or his agent was directly involved or of which he must have records. See *Medusa Portland Cement Co. v. Marion Coal & Supply Co.*, 204 Pa. Super. 5, 201 A.2d 285 (1964). See generally 2 Goodrich-Amram 2d § 1209(c):1, at 278–81 (1976), and cases cited therein. "A pleader is not required to make inquiry of third persons when it is likely that they would not disclose the desired information to the pleader and when in any event he would have no guarantee of the accuracy of this information." 2A R. Anderson, Pennsylvania Civil Practice § 1029.10, at 560 (1969). Such is the case here. Having no guarantee of the accuracy of McDonald's deposition evidence, appellees could not be charged with his knowledge, and could legitimately aver their own lack of knowledge and put appellant to her proof.

On the merits of her assumpsit claim, appellant contends that the court erred in entering a compulsory non-suit. A non-suit, of course, is to be entered only in clear cases; the plaintiff must be given the benefit of all evidence favorable to her, together with all reasonable inferences of fact arising therefrom; and any conflict in the evidence must be resolved in her favor. *E. g., Apple v. Reichert*, 443 Pa. 289, 293, 278 A.2d 482, 484 (1971). But it is also true that appellant must meet the exacting evidentiary burdens placed by our law upon one who seeks to establish an oral contract to make a will. These burdens were summarized by us in *Fahringer v. Strine Estate*, 420 Pa. 48, 53–55, 216 A.2d 82, 85–86 (1966):

"Certain rules have been established in this area of the law: (a) a contract to make a will or to bequeath by will, as other contracts, must be established by proof of an offer, an acceptance and legal consideration (*Reynolds v. Williams*, 282 Pa. 148, 127 A. 473; *Kocher Estate*, 354 Pa. 81, 46 A.2d 488; *Goldstein Estate*, 384 Pa. 1, 119 A.2d 278); (b) the *terms* of the contract must be shown with certainty and lucidity (*Soffee v. Hall*, 377 Pa. 306, 105 A.2d 144; *Hook's Estate*, 207 Pa. 203, 56 A. 428); (c) the evidence

must be scrutinized with great care (*Burgess v. Burgess,* 109 Pa. 312, 1 A. 167; *Bradshaw's Estate,* 243 Pa. 114, 89 A. 831; *Stafford v. Reed,* supra [363 Pa. 405, 70 A.2d 345]); (d) there must be 'direct evidence' in proof of the contract (*Calvert v. Eberly,* 302 Pa. 152, 156, 153 A. 146; *Consentino v. Vittoria,* 394 Pa. 538, 541, 147 A.2d 839); (e) as in the case of other claims against a decedent's estate, the evidence in proof of the contract, must be 'clear, direct, precise and convincing' (*Petro v. Secary Estate,* 403 Pa. 540, 170 A.2d 325; *Klemow Estate,* 411 Pa. 136, 140, 191 A.2d 365); . . .

. . . There must be shown by believable testimony that the decedent, *in the presence of the claimant,* made statements, in the form of a promise or offer, upon which the claimant could reasonably be expected to act in reliance on such statements. Such a rule is sound because a contract to bequeath by will must be shown as any other contract must be shown; essential to such proof is evidence that the minds of the parties met on the terms of the contract . . . (footnote omitted) (emphasis in the original).

Once again, appellant is faced with the terms of paragraphs 5 and 6 of the antenuptial agreement, quoted *ante* at 624. Assuming, *arguendo,* that appellant could contradict the plain meaning of this language,[12] it is plain from the record that appellant simply did not sustain her burden of showing a promise by evidence that is "clear, direct, precise and convincing." *Fahringer v. Strine Estate, supra.* There is no need to repeat the review of the evidence set forth above. It is sufficient to say that Edward's testamentary desires, both as testified to and as recorded in the proposed wills by McDonald, differed in significant respects from appellant's claim that the entire estate (less $15,000 in specific legacies) was to go to her.[13] We agree with the court below that "[t]o characterize these events as amount-

**12.** Appellant's contention that these portions of the agreement reflect a promise to make a will is frivolous.

**13.** The only testimony directly concerned with the making of a promise in the presence of another was the following:

ing to a contractual relationship between decedent and claimant, as claimant would have us believe, would result in virtually every estate plan prepared by a lawyer for a husband and wife being a contractual relationship." (Opinion of Keim, J., at 26).[14]

## IV.

Remaining for consideration is the attack on the lower court's ruling that appellant was incompetent to testify under the "Dead Man's Act." [15]  First, it is asserted that the Act was waived because the executor raised no objection to appellant's competency and because the intervening defendants, legatees under the probated will, had no standing to do so.  This argument ignores the fact that the executor, without objection, took the position of stakeholder in this litigation.  Moreover, the legatees could and did properly assert the statute.  See *Reap v. Dougher*, 261 Pa. 23, 103 A. 1014 (1918); *Lieber v. Eurich*, 201 Pa.Super. 186, 188, 192 A.2d 159 (1963).  Second, it is argued that the Act was waived when the executor took the stand to testify concern-

"Q.  Mr. McDonald referring to the meetings that you had with both Edward Friedman and Beatrice Kamile, both before and after their marriage, I believe those dates were the 2nd of December, the 7th of December, the 8th of December and the 14th of December. Now at any time during those meetings, did Mr. Friedman make any promises to then Beatrice Kamile or afterwards, Beatrice Friedman that he would leave her substantially all of his estate and if she would again, prior to the marriage, agree to marry him or for any other reason?

"A.  He did not make any promises in those words in return for a promise by Mrs. Freidman to marry him."

14.  Because we find the evidence insufficient to warrant a finding of a promise by decedent, we need not reach appellant's claim that the evidence shows that appellant provided consideration for the promise, or that in any event the contract was enforceable under the doctrine of promissory estoppel.  Nor need we consider the lower court's alternative holding that, since the estate consisted partly of realty, enforcement of any contract here would be barred by the Statute of Frauds.  See *Byrne Estate*, 122 Pa.Super. 413, 186 A. 187 (1936).

15.  Act of May 23, 1887, P.L. 158, No. 89, § 5(e), 28 P.S. § 322 (1958) since codified without substantive alteration in Section 5930 of the Judicial Code, 42 Pa.C.S. § 5930 (effective June 27, 1978).

ing the filing of the estate's first and partial account at a hearing held a year prior to the trial of appellant's claims, and mentioned in the course of his testimony that decedent had told him in a telephone conversation that he was planning to execute a premarital agreement. This too is without merit. The executor's testimony, made in the course of authenticating documents submitted in connection with this account, did not come within the terms of Section 1 of the Act of June 11, 1891, P.L. 287, No. 218, 28 P.S. § 325 (1958).[16] See, e. g., Gelb Estate, 425 Pa. 117, 121–22, 228 A.2d 367 (1967), and cases cited therein. There was no waiver of the Dead Man's Act by the appellees.[17]

The decree at No. 176 and the order at No. 203 are affirmed.

Each party to bear own costs.

MANDERINO, J., did not participate in the consideration or decision of this case.

ROBERTS, J., files a dissenting opinion in which LARSEN, J., joins.

16. Since superseded by Section 5933(a) of the Judicial Code, 42 Pa.C.S. § 5933(a) (effective June 27, 1978). The statute provides in pertinent part:

"[Hereafter] in any civil action or proceeding before any tribunal of this Commonwealth . . . although a party to the thing or contract in action may be dead . . . nevertheless any surviving or remaining party to such thing or contract or any other person whose interest is adverse to the said right of such deceased or lunatic party, shall be a competent witness to any relevant matter, although it may have occurred before the death of said party or the adjudication of his lunacy, if and only if such relevant matter occurred between himself and another person who may be living at the time of the trial and may be competent to testify, and who does so testify upon the trial against such surviving or remaining party or against the person whose interest may be thus adverse, or if such relevant matter occurred in the presence or hearing of such other living or competent person."

17. Appellant also argues that she should have been permitted to testify concerning her waiver of the family exemption. See Lock Estate, 431 Pa. 251, 261–64, 244 A.2d 677 (1968). But the lower court held that appellant was competent to testify on this issue, and appellant chose to present no testimony. The contention is therefore waived.

ROBERTS, Justice, dissenting.

The majority prevents Beatrice Friedman from sharing in any part of her husband's estate, first by holding her to the terms of a hastily signed antenuptial writing, and then by refusing to enforce her husband's unmistakable and enforceable promise to execute a will favorable to Beatrice. In so holding, the majority produces a result which, of course, would shock both Beatrice and Edward, as well as any other person familiar with the antenuptial agreement the couple so carefully formulated. Indeed, the undisputed facts demonstrate the existence of a clear and complete pre-marital plan. A will favorable to Beatrice is an essential and integral part of the package. Beatrice and Edward were afforded only enough time by Edward's attorney to sign but one instrument. The majority views this single writing in isolation so as to deny Beatrice everything. Beatrice and Edward signed a single writing not through any fault of their own, but because of the scrivener's asserted inability to make minor technical adjustments before Edward's unanticipated death. The parties clearly did not realize that a hasty signing of the antenuptial writing, without the simultaneous execution of Edward's will, could lead to the disastrous effects the majority's decision now produces. The majority ignores the circumstances of the execution of this single writing, including the fact that Beatrice was without counsel, and overlooks the time pressures on the parties. Only by abandoning the cardinal principle that parties to an antenuptial agreement share a uniquely confidential relationship and owe each other "the duty of frank and unreserved disclosure of all circumstances which materially bear on the contemplated agreement,"[1] can the majority give exclusive and controlling effect to the antenuptial writing signed in a less than "frank and unreserved" atmosphere. I must dissent.

1. *Valish Estate*, 431 Pa. 88, 97, 244 A.2d 745, 750 (1968). Accord, *Harrison Estate*, 456 Pa. 356, 319 A.2d 5 (1974); *Hillegass Estate*, 431 Pa. 144, 244 A.2d 672 (1968); *Warner Estate*, 210 Pa. 431, 59 A. 1113 (1904).

On December 2, 1973, prior to their marriage, Edward Friedman, age 71, and Beatrice Kamile, age 58, met with Edward's attorney, Gene McDonald in Latrobe, Pennsylvania, Edward's home town.  At that meeting, Edward expressed his wish that Beatrice receive all of his property upon his death except for $15,000.  While disavowing all interest in Beatrice's property, Edward expressed his desire to retain control over his own property only if the marriage ended in divorce.  Beatrice stated that she wanted her property divided between her children upon her death.  Following this meeting, McDonald undertook to prepare an antenuptial writing and wills embodying the clearly expressed intentions of Edward and Beatrice.

Because attorney McDonald did not have the antenuptial writing and wills prepared, the marriage planned for December 6 was postponed for one day.  The documents were presented to Edward and Beatrice for the first time on December 7 in McDonald's office, shortly before the marriage ceremony was to take place.  Under the written terms of the draft of Edward's will, Beatrice was to receive all of his assets except a $15,000 bequest to two nephews and a niece.  Edward, however, expressed some reservation about the $15,000 bequest.  McDonald said he could not redraft the $15,000 bequest in time for the scheduled marriage ceremony.  Instead, just minutes before the ceremony, McDonald suggested that the antenuptial agreement be signed immediately and the wills be taken care of after the marriage.  At no time did McDonald or Edward offer any suggestion or evidence the slightest concern that this action might deprive Beatrice of the only significant benefit she was to receive from the antenuptial agreement and at the same time work a forfeiture of all her rights.

On the next day, December 8, McDonald brought the original draft of Edward's will to Edward's home in Latrobe. The provision for Beatrice was unchanged.  At Edward's suggestion, McDonald met with the couple several days later to discuss minor alterations in his will, none of which affected Beatrice's rights.  A new will with these adjustments was

typed on December 17. On December 18, Edward Friedman died.

It is of great significance that under the antenuptial writing, as the majority interprets it, Beatrice was to give up all her rights to Edward's property during and after his life. Unless she was provided for in Edward's will, she received nothing in return. On the other hand, upon execution of the antenuptial writing, Edward received all that he expected. In these circumstances, it is simply not enough to say, as the trial court did, that "[b]oth the decedent and the claimant may have acted unwisely and with little caution in regards to the consequences of their haste in signing this [antenuptial] agreement." The failure to inform Beatrice that the delay in the execution of Edward's will might have adverse consequences upon her interests such as in the circumstances of this case, should compel this Court to respect the parties' clear, mutual, and express intention rather than to view the antenuptial writing as the complete expression of their contract.

The majority acknowledges that in reviewing the trial court's entry of a compulsory nonsuit, it must afford the plaintiff the benefit of all favorable evidence and all reasonable inferences to be drawn therefrom and must resolve all evidentiary conflicts in plaintiff's favor. *Apple v. Reichert*, 443 Pa. 289, 293, 278 A.2d 482, 484 (1971). Despite its awareness of this standard, the majority obscures the undisputed and controlling facts which, when properly viewed, entitle Beatrice to the benefit of Edward's promise.

In *Fahringer v. Strine's Estate*, 420 Pa. 48, 216 A.2d 82 (1966), this Court articulated the standard of proof necessary to show a contract to make a will. The majority determined that the requirements of *Fahringer* have not been met because the appellant did not demonstrate a promise to make a will by "clear, direct, precise and convincing" evidence. The majority further states that the draft of Edward's will differed significantly from appellant's claim that Edward intended to bequeath all but $15,000 of his estate to appellant. The majority simply refuses to recognize the facts of record.

This is not a case in which an interested party offers uncorroborated testimony that a decedent has promised to include him in his will. Whatever suspicion may fairly be cast upon such testimony it is clear that in the present case there is no cause for such doubts. Here the decedent's attorney has testified without contradiction or impeachment that Edward Friedman intended to devise all of his estate (except for $15,000) to his wife Beatrice and that he specifically directed his attorney to carry out that intention in drafting his will. The evidence, moreover, is clear that this bequest was to be part of a complete antenuptial agreement consisting of the writing and the wills. McDonald testified that he explained to Edward and Beatrice that their wills "fit together" with the antenuptial writing. To illustrate this point to Beatrice and Edward, McDonald interlocked his fingers. Assenting to that specific agreement, the parties were married. Edward's drafted will, approved by him in all respects pertaining to Beatrice, itself demonstrates the exact terms of his expressly intended bequest. The draft of Beatrice's will, by providing for the disposition of the bequest from Edward, further revealed that Edward's will was an essential component of their understanding and agreement. It is unreasonable to conclude that there is no clear, direct, precise and convincing evidence that the execution of Edward's will was a part of Edward's contractual promise to Beatrice. On the contrary, the evidence clearly establishes that contractual promise.

A simple reading of the draft of Edward's will demonstrates that appellant's claim that she was entitled to receive all but $15,000 of Edward's estate is meritorious. That estate was to be placed in trust for the benefit of Beatrice. The majority's statement to the contrary is unexplainable.[2]

2. Recognition that the antenuptial agreement here included a contract to make a will does not threaten, as the trial court feared, to convert "virtually every estate plan prepared by a lawyer for a husband and wife" into a "contractual relationship." Plainly, not every such plan may be an essential and integral part of an agreement by which a prospective wife otherwise forfeits all her rights to her husband's property.

Finally we must consider the impact of the antenuptial writing itself. Of particular significance are the following terms:

"5. In the event that Edward predeceases Beatrice, then Beatrice shall receive no assets from the estate of Edward except those assets or interest in his estate which shall be devised to Beatrice in any Will which Edward shall make after the date of this agreement."

"6. Nothing contained in this Agreement shall be deemed to constitute a waiver by either Edward or Beatrice of any bequest, legacy or interest in an estate that may be left by one to the other. The parties acknowledge that no promises have been made by either of them to the other with respect to any such bequest or legacy except as herein specifically provided."

The majority ignores paragraph five's reference to an interest in Edward's estate which "shall be devised to Beatrice," and determines that, regardless of all other evidence, paragraph six absolutely precludes the existence of a contract to make a will. Had no bequest whatsoever been promised, as the majority believes, the parties would not have had any reason to include the exception clause in paragraph six.

Even if the antenuptial writing does not specifically include a promise to make a will, exclusive reliance upon paragraph six is a misapplication of the standard of review of compulsory nonsuits and evidences disregard for the clear, uncontradicted facts. Appellant has offered evidence that paragraph six, as interpreted by the majority, simply does not reflect the understanding of either of the parties. The testimony of Edward's attorney firmly demonstrates that the parties intended to execute Edward's will at the same time as the antenuptial writing. Their failure to execute the will in no way demonstrated an intent to modify their unmistakable antenuptial plan and agreement. Moreover, the suggestion that the signing of the will be delayed was made at a time just prior to the marriage ceremony when Beatrice, without independent counsel, was least likely to be able to exercise businesslike judgment. Her failure to ob-

ject to the delay and her failure to object specifically to paragraph six, under the circumstances, does not in and of itself defeat Edward's contractual promise to make a will. Thus, Beatrice has adequately demonstrated that any contrary conclusion which might be drawn from paragraph six does not reflect the parties clearly expressed intentions.[3] To hold otherwise would be to disregard the realities of the circumstances and the high fiduciary duty owed to Beatrice.

Although I conclude that Edward and Beatrice executed an enforceable contract to make a will under which Beatrice can recover, I would also note that at the very least, Beatrice is entitled to her statutory share of Edward's estate. This court's observations in *Warner's Estate*, 210 Pa. 431, 59 A. 1113 (1904), where an antenuptial agreement was set aside, are particularly apt:

"She [the wife] was surrounded by Dr. Warner [her husband] and his attorneys, and it does not seem to have even been suggested she should have advice of friends. 'To say she was bound, when the contract was proposed, to exercise her judgment; that she ought to have taken advantage of the opportunity that existed to obtain information; that, if she did not do so, it was her own fault—is to suggest what would be revolting to all the better feelings of women's nature.' *Kline v. Kline*, 57 Pa. 120, 98 Am. Dec. 206. To have selfish and interested motives at such a time cannot be imputed to her. She had a right to assume that her prospective husband would act justly with her."

Beatrice, unaided by the advice of counsel, was entitled to believe that Edward would execute the will which had been drafted and which he had approved just prior to the marriage in all respects concerning her. That will was emphatically described as an interlocking part of the overall ante-

3. Appellant argues, and this court has recognized, that a mistake in the terms of a written agreement need not prevent the effectuation of the parties' true mutual intentions. See, *e. g., Evans v. Marks*, 421 Pa. 146, 218 A.2d 802 (1966); *McFadden v. American Oil Co.*, 215 Pa.Super. 44, 257 A.2d 283 (1969); 9 Wigmore, Evidence § 2417. *Cf. Bollinger v. Central Pa. Quarry Stripping & Constr. Co.*, 425 Pa. 430, 229 A.2d 741 (1967).

nuptial plan. Beatrice was likewise entitled to assume that her prospective husband and his attorney would not deprive her of this benefit by a course of conduct which all concerned believed to have only technical significance. This Court stated the fundamental principle in *Hillegass Estate*, 431 Pa. 144, 149, 244 A.2d 672, 675 (1968):

> "Parties to an Antenuptial Agreement providing for the disposition of their respective estates do not deal at arm's length, but stand in a relation of mutual confidence and trust that calls for the highest degree of good faith . . ."

To hold in these circumstances that Beatrice should be barred by the isolated antenuptial writing from receiving the benefit of her statutory share of Edward's estate is to deprive her of protection which this Court has always been eager to preserve. See *Harrison Estate*, 456 Pa. 356, 359, 319 A.2d 5, 7 (1974). The majority, therefore, compounds its error in refusing to recognize the contract to make a will by also denying appellant her statutory elective share.

For the foregoing reasons, I would reverse both the decree of the orphan's court dismissing appellant's objections to the probate of the 1967 will and the trial court's grant of appellees' motion for compulsory nonsuit. I would remand the case for entry of a decree consistent with this opinion.

LARSEN, J., joins in this dissenting opinion.