## Weizer Estate

*Harry M. Sablosky*, for petitioners.

*Arnold H. Rosenberg*, for respondent.

OPINION BY TREDINNICK, J., NOVEMBER 12, 1980:

Margo Weizer, decedent's widow has filed an election to take against her husband's will and a claim for the family exemption. The executors have petitioned the court to vacate the election and the claim contending that the widow has given up those rights in a post-nuptial agreement. The existence and content of the post-nuptial agreement is conceded by the widow but she contends it is invalid because (1) there was neither a full and fair disclosure of decedent's assets in conjunction therewith, nor reasonable and adequate provision for her, and (2) her execution of it was the product of coercion. After hearings, the matter is before the court for disposition.

The decedent, Harry Weizer, a widower since the death of his first wife on February 8, 1974, married Margo Schotz on November 6, 1974. The post-nuptial agreement was executed on November 12, 1974. It recites that Harry ". . . has made a full and fair disclosure to Margo of his financial worth . . .

approximately $325,000 . . ." and sets forth the particulars in exhibit "A" attached. Among the assets listed in exhibit "A" was an ownership interest in Supreme Manufacturing Co., Inc., listed at $25,000.

Each party generally released all rights in and to the estate of the other, including the right to elect to take against the will and to claim the family exemption. Harry agreed that if he predeceased Margo, his executors were to pay her $25,000, and she was to have a life estate in premises "in which they both reside." In fact, his will so provided. However, he made no other provisions therein for Margo.

The two issues identified in the first paragraph hereof will be discussed seriatum, preceded by the facts which pertain to these separate contentions.

First, Margo contends that the disclosure of assets was fatally defective because the value of Harry's interest in Supreme Manufacturing Company, Inc., was grossly understated and that the provisions made for her were neither reasonable nor adequate.

Supreme Manufacturing is engaged in the manufacture and sale of dental and surgical instruments. Decedent started the business in 1946. In the early 1950's his son joined him in a partnership. In 1972 the corporation was formed. Father and son each received half the stock. It is a small business, having twelve employees in 1974. By that time, the decedent, then age 73, had virtually retired from active management of the business, although he usually spent part of each day on the premises handling one phase of fabrication of instruments. He was generally aware of the condition of the business, but the corporation was under the active leadership of Joseph Weizer. After joining his father in 1950, Joseph designed and installed specialized machinery which converted what had been essentially a hand manufacturing operation into machine production. He also acted as the sole salesman. The corporation traditionally had only three customers — the U.S. Government and two wholesalers. The government business formed about eighty percent of the total, and depended upon the submission of successful bids. Joseph Weizer prepared the bids and developed considerable expertise in that area.

Corporate tax returns covering the period from the for-

mation of the corporation until the end of its 1974 fiscal year, October 31, 1974, were received in evidence. They show almost level gross sales and profits through the first eighteen months[1], and then a dramatic increase in the fiscal year ending October 31, 1974. Gross sales were up 160% to $476,882, and gross profit equaled $292,422. Salaries to decedent and his son were each $34,800.

Margo produced three witnesses concerning valuation of decedent's interest in the corporation as of November 12, 1974. One testified the overall worth of the company to be $363,366, and thus decedent's one-half interest would be presumably,[2] one-half that, or $181,683. A second testified that the total value of the company was "at least" $200,000, and a one-half interest was worth half that. Her third witness testified that there was a market for a fifty percent interest in such a business in 1974.

The executor's valuation expert expressed the opinion that the market value of the business as of October 31, 1974, was $210,000, but because the company suffers from "thin management", and because the purchase of a 50% would not bring control, a half interest was worth only $74,000. As of October 1, 1973, the value of a 50% interest was $30,000.

One further fact should be mentioned — as part of a buy-sell agreement, decedent and his son had set $40,000 as the total value of the business in 1974.

As difficult as it may be, it is necessary for the court to evaluate the expert's testimony and come to some determination of value. A discussion of the basic issue cannot proceed without that. Of the three experts who valued the business, we are of the opinion that the lower estimate is the more reliable. Although the company performed remarkably well in fiscal 1974, it was essentially a one-executive operation operating in a very thin and speculative market. Unless its government bids were successful, it stood to lose eighty percent of its business. Taking these factors into account, a significant discount for a one-half interest seems highly likely. Accordingly,

---

1. The first return covers only a six month period.

2. He never actually said.

we accept the value of decedent's one-half interest at $74,000.

Decedent, it will be recalled, listed the value of that interest in the post-nuptial agreement at $25,000, thus apparently understating it by $49,000. Was that discrepancy such that it may be said that decedent did not make a full and fair disclosure of his assets?

The following principles seem firmly established: (1) The agreement is presumptively valid and the burden of proof is upon the party seeking to establish its invalidity. (2) Where value is in question, the matter is to be viewed as of the date of the agreement, and not by hindsight. (3) The requirement of full and fair disclosure does not mean precise, exact values must be set forth: *Hillegass Est.*, 431 Pa. 144.

Bearing these basics in mind, we note that as of November 12, 1974, neither the fiscal 1974 tax return nor the accountants' balance sheet for the fiscal year were in existence. By that date, the company's accountants had done no more than gotten the raw data. Had Harry Weizer been actively managing the business, it would be reasonable to charge him with knowledge that the corporation was having a good year. He was not in that position. Rather he spent a few hours each day performing a manufacturing function. How much he knew about the fiscal condition of the company is open to question. His son testified he was generally alert and aware, but also that he did not know the "day to day" dollar volume, and did not follow company progress by talking with the accountants. It is fair to charge him with a general knowledge that the company was having a good year, but not with specific knowledge as to the magnitude thereof. The last hard figures he had seen, so far as the evidence shows, were those of fiscal year 1973, which he presumably saw early in 1974. They showed a book value of $34,567. Considering those factors, and that valuation of a one-half interest in a family business is difficult at best, the disclosure was "full and fair". While it has been said that percentages are of little value (*Emery Est.*, 362 Pa. 142, 147), still, it is one basis for comparison. In the present matter, if the excess were added to the gross estate listed by decedent, it would increase it only thirteen percent. Greater deficiencies have been upheld as fair disclosure: *Estate of Friedman*, 483 Pa. 614.

14

Furthermore, it is difficult to conclude that disclosure of this added value would have had any effect upon the situation. Margo repeatedly said, throughout the short period the agreement was under discussion, that she was not interested in Harry's money. She signed the agreement contrary to her attorney's advice.

Where a nuptial agreement has been accompanied by full and fair disclosure of assets, it is not required that the agreement make reasonable and adequate provision for a spouse. It is, therefore, unnecessary to consider the latter issue here.

We turn to the contention that the agreement was the product of coercion, and commence with a recitation of the facts bearing on this issue.

Conflicting testimony was received concerning the attitude of decedent's children relative to his interest in marrying Margo. They testified they had no opposition to it. Margo stated that Harry reported his children as being strongly opposed. Whether they were or not is relatively unimportant to the issue. The fact is that shortly after the marriage Harry called his attorney and said he'd made a terrible mistake, and wanted an annulment or a divorce. His attorney was not optimistic. The talk turned to a post-nuptial agreement. During the courtship, Harry's attorney had discussed and advised a pre-nuptial agreement be prepared and executed. One suspects that the primary problem on Harry's mind was his failure to obtain that agreement before marriage, so as to protect the interests of his children. For upon being advised to pursue a post-nuptial agreement, he immediately told Margo that either they would have to get a divorce, or enter into such an agreement. Otherwise, he said, his children would disown him. She agreed to the post-nuptial agreement. A preliminary conference was arranged with Harry's attorney, who quite properly insisted that she be represented by her own counsel. The agreement was prepared and thoroughly reviewed by her counsel with her. Despite her attorney's advice not to sign it because he considered it deficient in several particulars, she did, stating several times that she was not interested in Harry's money, but in him.

On this state of facts, it is contended that the agreement

must be stricken as Margo's execution of it was the product of coercion.

Our case law on nuptial agreements frequently recites in general terms what is necessary for their validity, including therein a requirement that there must be an absence of ". . . fraud, coercion, or unlawful purpose . . ." See *White v. White,* 225 Pa. Super. 499. It is rare indeed, however, that the issue in such cases involves coercion. The concept is, however, one of general contract law, which, of course, applies to nuptial agreements: *Levine Est.,* 383 Pa. 354. The question is, then, whether the above conduct constitutes coercion, or duress in law, so as to void the contract?

Duress has been defined as that degree of restraint or danger, either actually inflicted or threatened and impending, which is sufficient to overcome the mind of a person of ordinary firmness: *Smith v. Lenchner,* 204 Pa. Super. 500, 504. Unless a weakness or infirmity is shown, one is presumed to possess the ordinary ration of firmness: *Carrier v. Wm. Penn Broadcast Co.,* 426 Pa. 427. There can be no duress where a party had an opportunity to consult with counsel and where no threats of actual bodily harm were made: *Otto v. Powers,* 177 Pa. Super. 253.

The issue of coercion appears not to have reached our appellate courts in a nuptial agreement case. In the case of *Archer v. Archer,* 90 York 47, however, a post-nuptial agreement was stricken, where the court found that the wife had been physically accosted and threatened with death if she refused to sign.

In the present case, no physical threats were made against Margo at all. Furthermore she consulted with an attorney before signing the agreement. There is no doubt that she was confronted with psychological pressure to enter into an agreement, but it is equally clear that this does not constitute legal duress entitling her to dismantle the agreement.