J-A04045-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

MORGAN LOMBARD

v.

MATTHEW STROUSE

    Appellant

: IN THE SUPERIOR COURT OF
:     PENNSYLVANIA
:
:
:
:
:
:
:
:
: No. 1322 MDA 2022

Appeal from the Order Entered August 23, 2022
In the Court of Common Pleas of Lycoming County Civil Division at
No(s):  FC-2019-20324-CU

BEFORE:  STABILE, J., DUBOW, J., and McCAFFERY, J.

MEMORANDUM BY McCAFFERY, J.:        **FILED: APRIL 13, 2023**

Matthew Strouse (Father) appeals from the order entered in the Court of Common Pleas of Lycoming County, awarding Morgan Lombard (Mother) primary physical custody, Father partial physical custody, and both parties' shared legal custody with respect to their minor son, E.S. (Child), born in November 2016.  After careful review, we affirm.

The record reveals that Father and Mother (collectively, Parents) were never married.  After birth, Parents and Child lived together in a home Father owns, but separated in February 2019, when Child was two years old.  N.T., 8/4/22, at 4; N.T., 8/18/22, at 79-81.

Mother resides in Jersey Shore, Pennsylvania, with her husband, Fred Lombard, M.D. (Stepfather), her two daughters with Stepfather, aged sixteen months and two months at the time of the hearings, and Child.  N.T., 8/4/22, at 3-4.  Mother was a registered nurse but stopped working in December 2020.

*Id.* at 3. She and Stepfather were married on January 10, 2020, and he is employed as a primary care physician in Williamsport, Pennsylvania. *Id.* at 4.

Father resides in Montoursville, Pennsylvania, with his fiancé, her daughter from another relationship, and Child. N.T., 8/18/22, at 78-79. Father has lived on the same property since 2010. *Id.* at 79. He currently works for a heavy machinery company as the general manager.[1] *Id.* at 80; N.T., 8/4/22, at 18.

After their separation, Parents verbally agreed to a two, two, three custody arrangement.[2] N.T., 8/4/22, at 7; N.T., 8/18/22, at 84. Nevertheless, Mother initiated the underlying custody action in April 2019. On July 3, 2019, the trial court entered an interim order awarding Parents shared legal and physical custody. *See* Order, 7/3/19. Subsequently, the trial court appointed a guardian *ad litem* (GAL) for Child. The GAL interviewed the parties and various individuals close to the parties, and filed a report with the court prior to the initial custody trial. *See* Report of Guardian Ad Litem, 11/25/19. By agreed-upon order dated December 3, 2019, the trial court directed, *inter alia*, that Parents would share legal and physical custody of

---

[1] Father's family previously owned the business, but the family sold it in August 2021. N.T., 8/18/22, at 80. When his family owned the business, Father was the vice president and general manager. *Id.*

[2] A two, two, three custody arrangement involves a two-week, repeating schedule wherein the child spends two days with one parent, the next two days with the other parent, then three days with the first parent. The schedule switches the following week and repeats thereafter.

Child on a two-week, repeating schedule.[3]   *See* Order, 12/3/19, at 1-3 (unpaginated).

Approximately one year later, on January 28, 2021, Mother filed a petition to modify custody and requested primary physical custody of Child. *See* Mother's Petition for Modification of Custody, 1/28/21. Prior to trial, on March 19, 2021, Mother filed a petition for a psychological custody evaluation. The parties agreed to have the evaluation performed by Penelope J. Miller, Ph.D., a licensed clinical psychologist.  Dr. Miller performed the evaluation on June 3, 2021, and provided a report to the court.  The court scheduled trial for December 20, 2021, but the case was continued to February 7, 2022, because Dr. Miller would be out of the country on that date.

Thereafter, on January 31, 2022, Father filed a counter petition seeking primary physical custody of Child.[4]   *See* Father's Petition for Modification of Custody/Petition for Special Relief, 1/31/22, at 1 (unpaginated).  The next day, Father requested a continuance because Mother filed a proposed order asking for sole legal custody, which she did not initially request in her petition for modification.  The parties agreed to continue the trial to July 2022. *See* Order 2/8/22.  Subsequently, the court entered an order on April 8, 2022,

---

[3] The custody order implemented a similar pattern to the two, two, three custody arrangement.

[4] Father also requested the court enter an order directing that Child be enrolled in one of two schools for the start of kindergarten that fall.  *See* Father's Petition for Modification of Custody/Petition for Special Relief at 1-2 (unpaginated).

directing that Eric Bernstein, Psy.D., perform a custody evaluation. *See* Order, 4/8/22.[5] Dr. Bernstein subsequently provided the court with his custody evaluation report dated June 26, 2022.

Meanwhile, on June 29, 2022, Mother filed an amended petition to modify custody to request both primary physical and sole legal custody of Child. *See* Mother's Amended Petition for Modification of Custody, 6/29/22, at 1 (unpaginated). The trial court, once again, rescheduled the trial for August 2022.

On August 4, 16, and 18, 2022, the court held a trial on the competing modification petitions. Mother testified on her own behalf and presented the following witnesses: (1) Courtney Weidler, Mother's friend and neighbor; (2) Benjamin Weidler, Mother's neighbor; (3) Stepfather; and (4) Jeannine Renee Sheddy, maternal grandmother. Father testified on his own behalf and presented testimony from: (1) Julie Route, Father's sister; (2) Joseph Strouse, paternal grandfather; (3) Claire Strouse, paternal grandmother; (4) Marissa Moore, mother of one of Child's friends; (5) Melissa Hamm, director of the Early Childhood Learning Center, where Child attends daycare; and (6) Elizabeth Sauers, Father's fiancé. Further, the parties stipulated to the admission of four reports: (1) the 2019 GAL report; (2) the psychological/custody evaluation by Dr. Miller; (3) the custody evaluation by

---

[5] The court noted that the parties agreed "they would benefit from having a custody evaluator, however, could not agree on who that evaluator would be." Order, 3/25/22. The court then chose Dr. Bernstein from a list of qualified evaluators the parties provided. *See id.*

Dr. Bernstein; and (4) the Bruce Chambers, Ph.D., critique of Dr. Bernstein's custody evaluation.[6, 7]  **See** N.T., 11/18/22, at 196.  Following arguments at the August 18, 2022, hearing, the court placed its ruling on the record in Mother's favor.  **See** N.T., 8/18/22, at 224-39.  Thereafter, on August 23, 2023, the court issued a custody order awarding Mother primary physical custody during the school year, and Father partial physical custody every other weekend and every Wednesday from after school until 6:30 p.m.  **See** Order, 8/23/22, at 2-3 (unpaginated).  The court awarded shared physical custody, one week on/one week off, during the summer.  **Id.** at 3.  The court also directed the parties share legal custody.[8]  **Id.** at 1-2.

---

[6] The parties additionally presented, and the court admitted, numerous exhibits.  Because most were not included in the certified record, including, but not limited to, all of the expert reports and the GAL report, this Court informally requested that the Lycoming County Court of Common Pleas provide the exhibits in a supplemental record, and the trial court complied. We remind counsel, however, that "[i]t is an appellant's duty to insure that the certified record contains all documents necessary for appellate review." **In re O'Brien**, 898 A.2d 1075, 1082 (Pa. Super. 2006) (footnote omitted); **see also** Pa.R.A.P. 1921 Note (stating, "Ultimate responsibility for a complete record rests with the party raising an issue that requires appellate court access to record materials.") (citation omitted).

[7] Father retained Dr. Chambers to rebut the custody evaluation report provided by Dr. Bernstein.  **See** Chambers' Review Critique of Dr. Bernstein's Custody Evaluation, 7/4/22.

[8] While the parties share legal custody in most respects, the order specifies that Mother has sole legal custody regarding Child's medical and dental treatment while Father has sole legal custody regarding Child's extracurricular activities.  **See** Order, 8/23/22, at 1-2 (unpaginated).

On September 15, 2022, Father timely filed a notice of appeal.[9] The trial court filed a Rule 1925(a) opinion on October 12, 2022.

Father presents the one issue for review:

Whether the court improperly weighed the custody factors in reaching its decision[?]

Father's Brief at 4[10] (unnecessary capitalization omitted).

_____

[9] We note that Father failed to concurrently file a concise statement of errors complained of on appeal with his notice of appeal pursuant to Pa.R.A.P. 1925(a)(i) and (b). *See In Re K.T.E.L*, 983 A.2d 745, 747 (Pa. Super. 2009) (holding that the failure to file a concise statement of errors complained of on appeal with the notice of appeal will result in a defective notice of appeal, to be disposed of on a case-by-case basis). However, approximately one week later, on September 23, 2022, Father filed the Rule 1925(b) statement. Since the delay was not prejudicial to any of the parties and did not impede the trial court's ability to issue a thorough opinion, we conclude the procedural error was harmless. *See Graves v. Graves*, 265 A.3d 688, 692 n.7 (Pa. Super. 2021) (mother's filing of Rule 1925(b) statement more than one month after notice of appeal was not prejudicial to the parties, and court issued opinion addressing claims presented in Rule 1925(b) statement).

[10] We note that Father listed the following four redundant, but similarly vague, issues in his Pa.R.A.P. 1925(b) statement:

1. Whether the [c]ourt improperly applied the custody factors in reaching its decision[?]

2. Whether the [c]ourt improperly weighed the custody factors in reaching its decision[?]

3. Whether the [c]ourt's decision was against the weight of the evidence presented at trial[?]

4. Whether the [c]ourt erred in granting Mother primary physical custody of the child when the weight of the evidence presented was against a decision of that nature[?]

Father's 1925(b) Concise Statement of Matters Complained of on Appeal, 9/23/22.

Our scope and standard of review related to Father's claim is well-settled:

> [T]he appellate court is not bound by the deductions or inferences made by the trial court from its findings of fact, nor must the reviewing court accept a finding that has no competent evidence to support it. . . . However, this broad scope of review does not vest in the reviewing court the duty or the privilege of making its own independent determination. . . . Thus, an appellate court is empowered to determine whether the trial court's incontrovertible factual findings support its factual conclusions, but it may not interfere with those conclusions unless they are unreasonable in view of the trial court's factual findings; and thus, represent a gross abuse of discretion.
>
> [O]n issues of credibility and weight of the evidence, we defer to the findings of the trial [court] who has had the opportunity to observe the proceedings and demeanor of the witnesses.
>
> The parties cannot dictate the amount of weight the trial court places on evidence. Rather, the paramount concern of the trial court is the best interest of the child. Appellate interference is unwarranted if the trial court's consideration of the best interest of the child was careful and thorough, and we are unable to find any abuse of discretion.
>
> The test is whether the evidence of record supports the trial court's conclusions.

*A.V. v. S.T.*, 87 A.3d 818, 820 (Pa. Super. 2014) (citations omitted).

The primary concern in custody cases is the best interests of the child. "The best-interests standard, decided on a case-by-case basis, considers all factors that legitimately affect the child's physical, intellectual, moral, and spiritual well-being." *B.S.G. v. D.M.C.*, 255 A.3d 528, 533 (Pa. Super. 2021).

Child custody actions are governed by the Child Custody Act ("Act"), 23 Pa.C.S. §§ 5321-5340. When determining an award of custody, a trial court is required to consider the 16 custody factors set forth in the Act:

**§ 5328. Factors to consider when awarding custody**

   **(a) Factors.** – In ordering any form of custody, the court shall determine the best interest of the child by considering all relevant factors, giving weighted consideration to those factors which affect the safety of the child, including the following:

   (1) Which party is more likely to encourage and permit frequent and continuing contact between the child and another party.

   (2) The present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child.

   (2.1) The information set forth in section 5329.1(a)(1) and (2) (relating to consideration of child abuse and involvement with protective services).

   (3) The parental duties performed by each party on behalf of the child.

   (4) The need for stability and continuity in the child's education, family life and community life.

   (5) The availability of extended family.

   (6) The child's sibling relationships.

   (7) The well-reasoned preference of the child, based on the child's maturity and judgment.

   (8) The attempts of a parent to turn the child against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm.

(9) Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.

(10) Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.

(11) The proximity of the residences of the parties.

(12) Each party's availability to care for the child or ability to make appropriate child-care arrangements.

(13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A party's effort to protect a child from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.

(14) The history of drug or alcohol abuse of a party or member of a party's household.

(15) The mental and physical condition of a party or member of a party's household.

(16) Any other relevant factor.

23 Pa.C.S. § 5328(a).

This Court has emphasized that the trial court, as the finder of fact, determines "which factors are most salient and critical in each particular case." *M.J.M. v. M.L.G.*, 63 A.3d 331, 339 (Pa. Super. 2013) (citation omitted). Further, we have explained that Section 5323(d) "requires the trial court to set forth its mandatory assessment of the [16] factors prior to the deadline by which a litigant must file a notice of appeal." *A.V.*, 87 A.3d at 823 (citation & quotation marks omitted). However:

In expressing the reasons for its decision, there is no required amount of detail for the trial court's explanation; all that is required is that the enumerated factors are considered and that the custody decision is based on those considerations. A court's

- 9 -

explanation of reasons for its decision, which adequately addresses the relevant factors, complies with Section 5323(d).

*Id.* (citations & quotation marks omitted).

The trial court placed its findings with respect to the Section 5328(a) custody factors on the record in open court. *See* N.T., 8/18/2022, at 227-32. Instantly, the trial court weighed factors (1), (8), and (13) in Mother's favor, but determined factors (3), (4), (5), (6), (9), (10), and (12) were neutral between the parties. Further, the court found factors (2), (7), (11), (14), (15), and (16) inapplicable in the present case. Notably, the trial court found factors (1) and (8) particularly determinative because the court concluded Mother was credible in "every regard" and that Father's testimony was not credible "because it was evasive, . . . he repeatedly said I don't know or I don't remember, and [he] wouldn't give straight answers to simple questions." N.T., 8/18/22, at 227, 230.

Turning to the merits of this appeal, Father baldly asserts that the trial court abused its discretion in fashioning the custody order. Father's Brief at 18. He emphasizes that although a majority of the custody factors either favored both him and Mother equally, or were inapplicable to the present case, the court disregarded those factors and focused solely on the three factors it found favored Mother. *Id.* at 18, 21. Rather, he argues, it was in Child's best interest to "maintain[ ] the status [quo] and continu[e] the shared physical custody of" Child. *Id.* at 22.

In support, Father cites *W.C.F. v. M.G.*, 115 A.3d 323 (Pa. Super. 2015). In that case, this Court reversed a trial court's order awarding primary

physical custody to the mother where the court concluded that "the statutory factors weighed heavily in favor of granting [the f]ather primary custody."[11] *Id.* at 331. Father's reliance on *W.C.F.* is misplaced here, however, because the court found **none** of the Section 5328(a) factors weighed in Father's favor and fashioned a reasonable custody order in light of its findings.

Primarily, Father is not entitled to relief on this claim because the trial court thoroughly considered all of the Section 5328(a) factors. The law is well-settled that the **trial court** determines which factors are most salient, weighs the evidence, and makes credibility findings. *M.J.M.*, 63 A.3d at 339. Here, the court made credibility findings for Mother and against Father. Accordingly, we discern no abuse of discretion.

Father specifically challenges the court's findings with respect to factors (1), (8), and (13). We begin with factor (8) — the attempts of a parent to turn the child against the other parent — since the court found this the most salient and critical factor. *See* N.T., 8/18/22, at 230. Father argues that the trial court incorrectly believed he was making statements to Child about Mother

---

[11] In *W.C.F.*, the trial court stated that while the Section 5328(a) factors favored the father more than the mother, it would not change primary custody because: (1) the father had not been the primary custodian previously; (2) the father did not request primary custody in his complaint; (3) the change would be "disruptive for the child;" and (4) the child would be in childcare rather than with a family member during the week. *W.C.F.*, 115 A.3d at 329-30 (citation omitted). On appeal, however, this Court determined the trial court's decision was "manifestly unreasonable[,]" considering its findings that the mother refused to cooperate with the father and was responsible for parental alienation. *See id.* at 331-32. Moreover, this Court also noted that the father had requested primary custody in an amended complaint. *See id.* at 330 n.2.

and Stepfather because the only evidence to support this proposition was from Mother and no other evidence supported her contention. Father's Brief at 19. Father contends the trial court dismissed the testimony by him and his family regarding statements reported to them by Child, and therefore, the court's findings were biased and unsupported in the record. *Id.* at 19-20.

Father merely questions the trial court's credibility determinations and the weight the trial court attributed to the evidence presented. This we cannot do. *See A.V.*, 87 A.3d at 820; *M.J.M.*, 63 A.3d at 339.

Regarding Section 5328(a)(8), the trial court stated the following:

> I am absolutely convinced that [Father attempts to turn Child against Mother and Stepfather]. The remarks that [Child] makes to both [Mother and Stepfather] make clear that's what's going on here and Father's response to it is to simply say, Mother's the one who is doing it. So everything he's doing, he denies and says it's all her. I don't believe it and I don't find Father's testimony credible as to that or almost anything he said because it was evasive, because he repeatedly said I don't know or I don't remember, and wouldn't give straight answers to simple questions. And the fact that he would acknowledge that he plays games with the [c]ourt's orders by parsing the language makes clear that's . . . exactly the kind of game playing he's been playing with [Mother] since [they] separated.

N.T., 8/18/22, at 230-31.

We discern no error. Significantly, the trial court emphasized specific analysis provided in the reports admitted into evidence. Regarding the GAL report, the trial court highlighted the following:

> "I am concerned that Father is engaged in a pattern of behavior intended to annoy Mother and is not always acting in [C]hild's best interest. So far I do not think he has done anything that has turned [C]hild away from Mother but Father's attitude

towards Mother is troubling and could end up being harmful to [C]hild as he gets older." Turned out to be prophetic because I think that's exactly what we are now dealing with.

N.T., 8/18/22, at 224, *quoting* GAL Report, 11/25/19, at 10. Regarding Dr. Miller's report, the trial court agreed that Father is "incapable of coparenting" and that it appears Father is "'quite angry at [Mother] and wants to win at any cost.'" N.T., 8/18/22, at 225, *quoting* Dr. Miller's Psychological/Custody Evaluation, 6/3/21, at 5. The trial court also highlighted excerpts of Dr. Bernstein's report, quoting the following, *inter alia*:

> I, too, question [Father's] motives as he appears more competitive and possessive of custody than focused on [Child's] needs. He appears to focus more on gaining advantage and encouraging [Mother's] struggle with [Child] than supporting her as a coparent.
>
> \*     \*     \*
>
> When comparing their efforts, [Father] appears more focused on competition and gaining advantage. While [Mother] may be overly controlling and micromanaging [Father's] parenting, unlike with [Father's] apparent motive, she seeks to support him and his needs.
>
> \*     \*     \*
>
> By [Mother's] report [Father] inappropriately coaches [Child] against [Stepfather] and his family, he exposes [Child] to adult issues. While [Father] similarly would accuse [Mother] of such actions, [Child's] show of rejection against [Mother's] authority tips the scales in favor of [Mother's] report as more persuasive.

N.T., 8/18/22, at 225-27, *quoting* Dr. Bernstein's Custody Evaluation, 6/26/22, at 17-18. The court concluded "Dr. Bernstein's concerns are this [c]ourt's concerns. . . ." N.T., 8/18/22, at 227. Finally, the court considered the report of Dr. Chambers, Father's expert, but determined the following:

Dr. Chambers' report really is a several page critique of Dr. Bernstein's opinion, but Dr. Chambers was not asked to, and did not meet with any of the parties or with [Child] and the [c]ourt gives Dr. Chambers' opinion little weight in light of the fact that Dr. Bernstein's report is consistent with Dr. Miller's findings as well as the GAL's report from 2019 and this [c]ourt's own conclusions after sitting through two and a half days of testimony.

*Id.*

The trial court's findings are also supported by the trial testimony. Mother testified on direct examination that Child says bizarre things he could only learn from an adult:

Q. And do you observe things with [Child] that lead you to believe he is struggling?

[Mother]. I do, yes.

Q. And what kind of things do you see with [Child]?

[Mother]. Well, he still doesn't always enjoy going with [Father]. He says a lot of things that are just bizarre and off the wall that he would never know exist unless somebody is, you know telling him that. He is — he acts out almost every exchange day he'll act out with me. He doesn't have to listen at my house. I used to follow [Father's] rules but now I don't. I follow my rules but he doesn't have to follow my rules. Stuff like that. . . .

[Child] is questioning now who his family is, you know. He's saying [S]tepfather is just a random person in his family and we just found that odd because he didn't say random. I mean, it was just a bizarre thing to say.

He is struggling, like, the other thing when he asked if our dog could have the last name Strouse because when his . . . oldest younger sister was being born he was told he was going to be the only Strouse in our house so he wanted the dog to be a Strouse as well so he wasn't the only one living there. There [are] things like that.

N.T., 8/4/22, at 21-22. Mother also testified that Child has expressed concern about being taken away:

Q. [Does] he still express concern about being taken away?

[Mother]. He does. He still will say that. He says, "I'm not allowed to tell anyone I want to live with you or I'll never see [Father] again, the [j]udge will take me away." . . . I don't know if he thinks the [j]udge is coming to my house or [Father's] house or where the judge is coming.

*Id.* at 23.

Stepfather also testified regarding his concerns with Child's behavior and statements:

Q. Do you see any things with [Child] that cause you concern?

[Stepfather]. I have more recently . . . . I've seen more things that are concerning to me. . . . [H]e's been probably a little bit more, you know, defiant at times and . . . it's part of the reason why we wanted to pursue, out of an abundance of caution, some counseling just to make sure there wasn't anything that we needed to be worried about. So we have all the resources for him that he would need just in case.

But I've seen him . . . struggle to sort of communicate with us about things that were clearly bothering him . . . and things that he would say that could only come from an adult and not from a five-year-old's imagination.

Q. And what do you mean by that?

[Stepfather]. [M]ost recently . . . I was playing with him in the basement and I was kind of commenting on all the cool toys he had and how much . . . fun our basement is, and then out of nowhere he would say, well, that's because [Father] gives you guys money . . . to buy me toys here. And I was just kind of like taken back by that. I was kind of like where could he possibly come up with that, you know. . . .

N.T., 8/16/22, at 134-35.

Additionally, during cross-examination, the court chastised Father for his "refusal or inability" to answer clear questions and his questioning the instructions of an order:

> Q. And so since we were in court in February of 2022, it's one, two, three — six activities counting swimming lessons twice that you signed him up for, right?
>
> [Father]. I don't count it as six but okay.
>
> Q. You count it as five?
>
> [Father]. Sure.
>
> Q. Okay.
>
> [Father]. I don't count [vacation bible school] as an activity either.
>
> Q. Well the order was pretty clear it was one [activity] per season, right?
>
> [Father]. What's a season? A T-ball season? A soccer season? A swim season? A summer, fall, winter, spring? Are we doing solstice?
>
> THE COURT: [Father], your refusal or inability to answer clear questions is not helping you.
>
> [Father]: I'm sorry, Your Honor. I'll try to answer them more clearly. I need clear direction as well.
>
> THE COURT: The question was isn't an order clear that says one activity per season, isn't such an order clear? And apparently that's not clear to you because you don't understand what could possibly be meant by season. Do we mean fall? Winter? Spring? Summer? Do we mean the soccer season? Seriously? Is that —
>
> [Father]: It deserves interpretation.
>
> THE COURT: Do we seriously game every order we issue? Is that what this is about? . . .

N.T., 8/18/22, at 184-85.

Accordingly, because we conclude the documentary and testimonial evidence supports the trial court's finding that the Section 5328(a)(8) factor favors Mother, we discern no abuse of discretion.

Regarding Section 5328(a)(1) — which party is more likely to encourage and permit continuing contact between the child and other party — Father contends that the trial court also erred in determining that this factor favored Mother. Father's Brief at 18. Father argues that the court incorrectly concluded that he engaged in acts to undermine Mother's authority and disparaged her in front of Child. *Id.* He insists that this conclusion is not relevant to this factor and is not supported by the record. *Id.* He further asserts that Mother's testimony regarding her desire to spend more time with Child for family activities and the fact that Mother repeatedly referred to Child as "my child," support his proposition that the trial court erred in finding that the Section factor (1) favored Mother. *Id.* at 18-19.

With respect to Section 5328(a)(1), the trial court stated on the record:

The [c]ourt believes that Father has engaged in a repeated act of attempting to undermine Mother's authority and disparage her to [Child]. There are accusations back and forth about withholding specific periods of custody. The [c]ourt's greater concern is the efforts that [F]ather has made to undermine Mother.

As I was listening to Father's testimony . . . there were a few things that I can only describe as gaslighting. [Father] was being asked about an exchange in Our Family Wizard where [Mother] is . . . repeatedly attempting to get him to answer a simple question about whether or not [Child] is going to participate in the Christmas play and he won't respond. And his response to counsel's question about that is [Mother's] constant follow-ups are just an example of her OCD and anxiety. So he ignores her and ignores her and ignores her so she has to

repeatedly ask for a simple answer and his response is . . . that's just her OCD and anxiety, it's not because I've been ignoring her for the last four weeks.

N.T., 8/18/22, at 227-28.

Mother testified that Father has ignored her while exchanging Child and, at times, has responded to her through Child. N.T., 8/4/22, at 12-14. On direct examination, Child's maternal grandmother confirmed that Father sometimes ignores Mother at exchanges, in front of Child:

> Q. Have you seen [Mother] attempting to communicate with [Father] at custody exchanges?
>
> [Maternal Grandmother]. Yes.
>
> Q. And what kind of things have you seen her attempting to communicate about?
>
> [Maternal Grandmother]. [J]ust simple things sometimes, like, hey, here's his hat, here's his lunch box, he needs this and this. And [Father] does not communicate verbally back or he'll ignore her.
>
> Q. And does he do that in the presence of [Child]?
>
> [Maternal Grandmother]. Yes.

*Id.* at 77-78. Mother also testified that Father has ignored her requests for information regarding Child's activities, namely T-ball and a Christmas play. *Id.* at 27-30.

Regarding the Christmas play, Father testified as follows on cross-examination as follows:

> Q. . . . The first message you received from [Mother] regarding [Child's] Christmas play was on November 17, 2021, correct?
>
> [Father]. That's what the page says, yes.

\* \* \*

Q. And it looks like you failed to respond to that question?

[Father]. I don't think that an immediate response was necessary. The level of urgency on a message like this is not very high and I don't think it requires an immediate response. In hindsight, I think I probably should have. This is part of my reflection that I've done through this process. I probably should have said I acknowledge you sent me the message, I'll get back to you when I have an answer.

\* \* \*

Q. And then my client emailed you again on November 21st asking about whether you planned to take him to the school play, correct?

[Father]. That's what the page says, yes.

Q. Then you responded with, "Why do you ask?" Right?

[Father]. That's what the page says, yes.

Q. And she wanted — she said, "Well, because obviously I'd like to attend if he's going to be there and it's your Saturday so I need to make arrangements." And again, you didn't let her know whether he was going to be at the play, correct?

[Father]. It doesn't look like I responded to her until [December] 3rd.

Q. All right. And the exhibit that you prepared for the [c]ourt, you would agree with me you left out all of these other exchanges, the first one being November 17th, 2021?

[Father]. Well, what I noticed about the exhibit 34 is that it appears to be a screen shot from a phone which wouldn't have been a report from a Wizard app so that's one of the differences that I notice.

\* \* \*

Q. So, it was just coincidental that you only included one from her on December 1st asking and you responding on December 3rd about his attendance and leaving out that the play was on December 4th?

> [Father]. I disagree. I think this more indicates [Mother's] OCD and anxiety about these things. This is not of an urgent play, a Christmas play. . . .

N.T., 8/18/22, at 169-71.

Thus, we conclude, again, the record supports the trial court's finding that Father does not provide straight answers to Mother's inquiries despite numerous messages from Mother, and, in fact, did not provide her with information regarding the Christmas play until the day before it occurred.

Further, we find no support in the record for Father's argument that Mother's desire to spend more time with Child for family activities equates to her discouraging contact between him and Child. Similarly, Mother referring to Child as "my child" during the proceedings is unpersuasive as there is no evidence that Mother said this to discourage contact between Father and Child. Therefore, Father's argument is without merit.

Finally, regarding the Section 5328(a)(13) factor — the level of conflict between the parties and their willingness to cooperate with one another — Father contends that the court erred in finding this factor also favored Mother because no evidence was presented that she made greater efforts than Father to cooperate. Father's Brief at 20. On the contrary, Father argues that he presented evidence that he had suggested counseling upon Parents' initial separation, but that Mother refused. *Id.* at 20-21. Father also asserts that he invited Mother to participate in mediation to resolve their custody issues, but Mother refused that as well. *Id.* at 21. Father concludes that there was

no evidence, other than Mother's "self-reporting," that she attempted to work with Father. *Id.*

Regarding factor (13), the trial court stated that there is "[s]ubstantial conflict in this case[, but it] is convinced that Mother has made greater efforts to cooperate with Father and Father has [not] reciprocated and so that factor favors Mother." N.T., 8/18/22, at 232. The court did not elaborate further regarding this factor, and we observe no error. Father is again asking this Court to reweigh evidence and make credibility determinations. As related *supra*, the trial court did not find Father credible and found Mother to be credible. Additionally, Mother and Stepfather testified in various instances that they support Child's relationship with Father, including purchasing gifts from Child for Father and his family, and encouraging Child to go with Father during exchanges when Child says he does not want to go. *See* N.T., 8/4/22, at 8, 33-35; N.T., 8/16/22 at 75, 99, 144.

Based on the testimony, and our review of the certified record, we conclude that the court reasonably weighed the Section 5328(a)(1), (8), and (13) factors. Accordingly, we discern no error or abuse of discretion by the trial court in weighing the custody factors and entering its August 23, 2022, order.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 04/13/2023